HORN et al. v. UNITED STATES.†

(Circuit Court of Appeals, Eighth Circuit.　November 5, 1910.)

No. 3,123.

1. POST OFFICE (§ 48*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT.
An indictment for devising and operating a scheme to defraud by means of the post office establishment, in violation of Rev. St. § 5480 (U. S. Comp. St. 1901, p. 3696), must charge that the accused devised some scheme or artifice to defraud; that he intended to consummate it by opening or intending to open correspondence or communication with some other person or persons through the post office establishment, or by inciting such other person to so open communication with him; and that in and for executing such scheme, or in attempting to do so, he either placed, or caused to be placed, in the post office, intending it to be carried and delivered by the United States mail service, a letter, circular, or advertisement, or shall have received one from another through the mail.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 71, 72; Dec. Dig. § 48.*]

2. POST OFFICE (§ 48*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT.
While the formation of some scheme or artifice to defraud is an essential element of the offense of using the United States mails in an intentional effort to defraud, in violation of Rev. St. § 5480 (U. S. Comp. St. 1909, p. 3696), the gist of the offense is the use, or attempted use, of the mails, for the forbidden purpose, and it is therefore only essential to charge the scheme with such particularity as will enable the accused to know what is intended and to apprise him of what he will be required to meet on a trial; the indictment being sufficient if it is distinctly alleged that the United States mails were intended to be used in consummating such scheme.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 71, 72; Dec. Dig. § 48.*]

3. POST OFFICE (§ 48*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT—FALSITY OF REPRESENTATIONS—KNOWLEDGE.
Where an indictment for misuse of the mails in furtherance of a scheme to defraud in the sale of worthless mining stock alleged that defendants represented in their literature sent through the mails to induce the purchase of stock, that the mine was a developed producing mine yielding ore of stated large value, while in fact it did not have ore of the quality or of the quantity stated, and no shafts had been sunk thereon, etc., the indictment was not fatally defective for failure to allege that the stock was not of the value for which it had been sold, or that defendants did not believe, or have reasonable cause to believe, that it was of such value, or that their representations were not in fact true.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 71, 72; Dec. Dig. § 48.*]

4. POST OFFICE (§ 48*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT—KNOWLEDGE OF FRAUD.
Where defendants were charged with having instituted and carried out a scheme to defraud in the sale of worthless mining stock, by means of the post office establishment, whether defendants in good faith believed, or had reasonable grounds to believe, that the alleged statements or representations made by them were true, was a matter of defense which the government was not required to negative in the indictment.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 71, 72; Dec. Dig. § 48.*]

5. POST OFFICE (§ 48\*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT.
   An indictment for misuse of the mails, in furtherance of a scheme to defraud by the sale of worthless mining stock, alleging that defendants' representations were in fact false and untrue and known by defendants to be so, constituted a sufficient averment, if such were necessary, that defendants did not in good faith believe, or have reasonable grounds to believe, that the representations were true.

   [Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 71, 72; Dec. Dig. § 48.\*]

6. INDICTMENT AND INFORMATION (§ 194\*)—FORM OF ALLEGATION—DENIALS—NEGATIVE PREGNANTS—DEFECTIVE FORM.
   That denials of the truth of alleged false representations in an indictment were in the form of negative pregnants did not render the indictment fatally defective under Rev. St. § 1025 (U. S. Comp. St. 1901, p. 720), providing that no indictment found by the federal grand jury shall be deemed insufficient because of any defect or imperfection in matter of form only that shall not tend to prejudice the defendant, especially where the allegations as a whole constituted a full and complete denial of the truth of the representations.

   [Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 627; Dec. Dig. § 194.\*]

7. INDICTMENT AND INFORMATION (§ 194\*)—FORM—SUFFICIENCY.
   Rev. St. § 1025 (U. S. Comp. St. 1901, p. 720), providing that no indictment found by a federal grand jury shall be deemed insufficient by reason of any defect or imperfection in matter of form only, that shall not prejudice the defendant, does not permit the omission of matter of substance, but applies where the only defect complained of is that some element of the offense is stated loosely and without technical accuracy; the test being whether the indictment contains every element of the offense intended to be charged, and sufficiently apprises accused of what he will be required to meet, and, in case other proceedings are taken against him, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

   [Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 627; Dec. Dig. § 194.\*]

8. POST OFFICE (§ 49\*)—SCHEME TO DEFRAUD—MISUSE OF MAILS—EVIDENCE.
   In a prosecution for misuse of the mails, in furtherance of a scheme to defraud by sale of worthless mining stock, evidence that one of the defendants promised witness that she should have a half interest in the profits of 28,000 shares of canceled or forfeited stock of a mining corporation, when it was resold by him, that she was to pay nothing for the stock, and when it was resold 5 cents a share was to go to the corporation, and the witness and defendant were to divide the balance, and that she had received $562 as her share of the part of the stock that had been sold, was properly admitted as against such defendant to show his method of dealing with the stock of the company.

   [Ed. Note.—For other cases, see Post Office, Cent. Dig. § 85; Dec. Dig. § 49.\*]

9. POST OFFICE (§ 49\*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—MAILING OF LETTERS—PRIMA FACIE EVIDENCE.
   In a prosecution for misuse of the mails in furtherance of a scheme to defraud by soliciting the sale of worthless mining stock, evidence *held* sufficient to show that letters set out in the indictment and alleged to have been mailed pursuant to such scheme were in fact mailed or caused to be mailed by the defendant, who wrote the same on the date of the postmark appearing thereon.

   [Ed. Note.—For other cases, see Post Office, Cent. Dig. § 86; Dec. Dig. § 49.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

10. **Post Office (§ 50\*)—Misuse of Mails—Scheme to Defraud—Purpose of Letters—Question for Jury.**

Where defendants were indicted for misuse of the mails in furtherance of a scheme to defraud by the sale of certain mining stock, and the indictment set out certain letters alleged to have been written and mailed by defendant pursuant to such scheme, whether the letters tended to connect the defendant with the scheme as alleged, or were mailed in execution or attempted execution thereof, was for the jury.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 88; Dec. Dig. § 50.\*]

11. **Criminal Law (§ 1043\*)—Direction of Verdict—Review—Ground.**

Where no ground is assigned in the trial court as the basis for the direction of an acquittal, an assignment of error based on the overruling of the request therefor may be disregarded on appeal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2654, 2655; Dec. Dig. § 1043.\*]

12. **Post Office (§§ 49, 50\*)—Misuse of Mails—Scheme to Defraud—Evidence.**

In a prosecution for misuse of the mails in furtherance of a scheme to defraud by the sale of worthless mining stock, evidence *held* to require submission of the case to the jury as to each of the defendants, and to sustain a conviction.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 86, 88; Dec. Dig. §§ 49, 50.\*]

13. **Post Office (§ 35\*)—Scheme to Defraud—Misuse of Mails—Defenses.**

In a prosecution for misuse of the mails in furtherance of a scheme to defraud by the sale of worthless mining stock, if any one or more of the defendants honestly believed that the representations made by him respecting the property were true, or had reasonable grounds to so believe, such belief would constitute a complete defense as to him.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.\*]

14. **Criminal Law (§ 829\*)—Trial—Refusal of Requests.**

There is no error in the refusal of requests to charge, which, so far as correct, were either given as requested, or were substantially embodied in the general charge of the court.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2011; Dec. Dig. § 829.\*]

15. **Criminal Law (§§ 823, 1038\*)—Appeal—Mistake.**

Where defendants did not direct the attention of the trial court to a mistake in the statement of facts in an instruction at the time it was given, and the court in a previous paragraph had correctly stated the allegations of the indictment in the respect in question, they were not entitled to rely on the error as a ground for reversal on appeal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1992–1995, 2646; Dec. Dig. §§ 823, 1038.\*]

16. **Criminal Law (§ 1137\*)—Appeal—Invited Error.**

Defendants were not entitled to rely for reversal on a plain mistake in the statement of facts in an instruction which obviously arose from a misstatement of facts in one of defendants' requests.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3007–3010; Dec. Dig. § 1137.\*]

17. **Criminal Law (§ 822\*)—Instructions—Consideration as a Whole.**

That excerpts from the charge standing alone are vulnerable to criticisms urged against them is immaterial, where the whole charge taken together is not erroneous.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1990–1995; Dec. Dig. § 822.\*]

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**18. CRIMINAL LAW (§ 1038\*)—REQUESTS TO CHARGE—NECESSITY.**
  Defendant cannot object on appeal that the charge was not sufficiently specific as to any given matter, in the absence of a request for a·more specific instruction at the trial.
  [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2646; Dec.· Dig.·§ 1038.\*]
  Sanborn, Circuit, Judge, dissenting.

In Error to the District Court of the United States for the W.estern District of Missouri.

Frank H. Horn and others were convicted of devising a scheme to defraud, to be effected by means of the post office establishment, and they bring error. Affirmed.

Chester H. Krum and Frank Hagerman (James S. Botsford, Chas. A. Loomis, Wash Adams, and Francis G. Hanchett, on the briefs), for plaintiffs in error.

A. S. Van Valkenburgh, U. S. Atty.

Before SANBORN and ADAMS, Circuit Judges, and REED, District Judge.

REED, District Judge. The plaintiffs in error, Frank H. Horn, Elisha ·S. Horn, Raymond P. May, and S. H. Snider, who will be called the "defendants," were convicted upon an indictment which charges them jointly with John E. Horn with having violated section 5480, as amended, of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 3696), and they prosecute this writ of error to reverse such judgment. John E. Horn does not complain of the judgment against him and does not join in the prosecution of the writ of error. Upon being arraigned the defendants demurred to the indictment, which was overruled, and this ruling is the first of the many errors assigned.

The indictment is in three counts. Count 1 is fairly representative of all, and that charges that the defendants, on or about September 15, 1906, devised a certain scheme and artifice to defraud H. E. Deaner, Fred E. Hess, and John J. McKelvey, and others, whose names are to the grand jurors unknown, and the public generally, to be effected by means of the post office establishment of the United States, which scheme is alleged to be substantially as follows: That the defendants and others had theretofore organized a corporation under the laws of the territory of Arizona, known as the Central Mining & Development Company of Arizona, with a capital stock of 10,000,000 shares of the par value of $1 each, which said corporation was to acquire certain mining properties in Pinal county, Ariz., known as the "Two Queens" group. That of said 10,000,000 shares of stock 5,200,000 shares were to be delivered to one Gardom as the purchase price of said property, 4,000,000 shares were to be set aside as treasury stock of said company, and the remaining 800,000 shares were to be allotted to defendants and others (in stated amounts) as remuneration for services in the promotion of said company and the sale of its stock. That the defendants were thereupon, by means of circulars and written and printed

matter to be sent through the post office establishment of the United States to the persons named and to the public generally, to present stock in said company for sale at prices ranging from 10 to 25 cents per share and solicit subscriptions to said stock at said prices; that the defendant Elisha S. Horn was to conduct the advertising of said mining company and its property through the public press and by means of letters, circulars, and printed matter, and receive as remuneration therefor 50 per cent. of all moneys received from the sale of stock, and in addition thereto 100,000 shares of said promotion stock. That Frank H. Horn was to act as the fiscal agent of said company and receive for his services 500,000 shares of said promotion stock. That it was further a part of said scheme that defendants were to represent to said persons named and to the public generally that the mining property of said company had produced ore assaying $200,000 to the ton; that said ore was a sample of a mineral ledge of great size running through said "Two Queens" group of properties; that said company had the ore and lots of it to show such assay; that said mines had been so far developed that the ores therein were no longer mere guesswork but were known to exist in paying quantities; that various development shafts had been sunk; that the two main shafts had reached ore of rich value; that the same was being sacked and saved until it could be handled in the plants of the company; that the officers in charge of said enterprise were mining men of great capacity and long experience; that such properties had been thoroughly examined and investigated by them; that the value of said property had been shown conclusively and had stood the most rigid tests known to the mining world. It is then alleged that in truth and in fact there were no ledges in said "Two Queens" group of which ore assaying a value of $200,000 to the ton was a fair sample; that said company had no ore in large quantities to show such assay; that no ores had been produced from said mines in sufficient quantity for shipment; that no shafts had been sunk or tunnels driven which had reached ore in paying quantities; that in truth and in fact at all times herein mentioned said mines were only at the prospecting stage; that no quantity of ore in said properties had been disclosed that would make certain or even probable any ore body in such quantity and of such value as to insure any practical value to said mining properties, as they, the defendants, then and there well knew; that no experienced or competent mining authorities had examined or tested said mining properties; that the work of development had not proceeded sufficiently to permit the same to be done, nor has it yet proceeded sufficiently to warrant any definite statement as to the value of said properties; that the officers in charge of said enterprise had no practical knowledge of mines and mining as they, the defendants, well knew. It is also alleged:

"That in truth and in fact it was never at any time the purpose of the defendants to develop said property, or any part thereof, as a real bona fide mining property so that the same might become a producing and paying mine; but, on the contrary, that it was the unlawful purpose of them, the defendants, to sell and dispose of said treasury stock for the purpose of getting possession of 50 per cent. of the purchase price thereof as aforesaid, and also for their own personal use and benefit to sell and dispose of said so-called promotion stock so to be given to them as aforesaid, and in general that it was

the purpose and intent of said defendants, by means of the false and fraudulent representations aforesaid, to induce the said H. E. Deaner, Fred E. Hess, and John J. McKelvey and others, and the public generally, to purchase the stock of said Central Mining & Development Company, and to pay the money for such purchase over to them, the said defendants, and that they, the said defendants, should convert the same to their own personal use and benefit, without rendering to the said purchasers a good and valuable equivalent therefor."

It is then alleged that the defendants having so devised said scheme and artifice to defraud and for executing the same and attempting so to do, on or about the 30th day of October, 1906, at Kansas City, Mo., did unlawfully place, and caused to be deposited, in the post office of the United States there, a certain letter to be sent and delivered by the said post office establishment of the United States addressed to H. E. Deaner, Saginaw, Mich., which letter is set out in full as a part of count 1.

In count 2 the letter set out is dated October 27, 1906, and addressed and mailed to Fred E. Hess, St. Louis, Mo.

In count 3 the letter is dated January 15, 1907, and addressed and mailed to John J. McKelvey, Pawtucket, R. I. The allegations of the indictment are thus stated at some length in view of the objections urged against it, and the other errors assigned in support of the writ of error.

The objections urged against the indictment are: (1) That it fails to allege that the stock of the Central Mining & Development Company (hereinafter called the "mining company") was not of the value for which it was to be sold by the defendants; (2) that it is not alleged that the defendants did not believe, or have any reasonable grounds to believe, that it was of such value, or that the other representations to be made by them were true; (3) that the alleged representations so to be made as to the stock, or the mining properties, are mere matters of opinion only; and (4) that there is no sufficient denial of the truth of the alleged representations that were to be made by the defendants.

Section 5480 of the Revised Statutes of the United States as amended (U. S. Comp. St. 1901, p. 3696) denounces as a crime the use of the United States mails in an intentional effort to defraud. The essentials of an indictment under the section necessary to be now stated are: (1) That the person charged must have devised some scheme or artifice to defraud; (2) that he intended to consummate the same by opening or intending to open correspondence or communication with some other person or persons through the post office establishment, or by inciting such other person to so open communication with him; and (3) that in and for executing such scheme, or in attempting to so do, he shall either place or cause to be placed in a post office of the United States, intending it to be carried and delivered by the United States mail service to some other person, a letter, circular, or advertisement, or shall receive one from another through such mails. Stokes v. United States, 157 U. S. 187, 188, 189, 15 Sup. Ct. 617, 39 L. Ed. 667; Miller v. United States, 66 C. C. A. 399, 133 Fed. 337–345; Brown v. United States, 74 C. C. A. 214, 143 Fed. 60; Brooks v. United States, 76

C. C. A. 581, 146 Fed. 223–227; Lemon v. United States, 90 C. C. A. 617, 164 Fed. 953–957; Erbaugh v. United States, 97 C. C. A. 663, 173 Fed. 433.

While the formation of some scheme or artifice to defraud is an essential element of the offense, the gist of the offense is the use or attempted use of the United States mails for the forbidden purpose. It is only necessary, therefore, to charge the scheme with such particularity as will enable the accused to know what is intended, and to apprise him of what he will be required to meet upon the trial; and if it is distinctly alleged that the United States mails are to be used, or are intended to be used, in consummating such scheme, that is sufficient. Durland v. United States, 161 U. S. 306–315, 16 Sup. Ct. 508, 40 L. Ed. 709; Brooks v. United States, 76 C. C. A. 581, 146 Fed. 223–227; Lemon v. United States, 90 C. C. A. 617, 164 Fed. 953–957; Ewing v. United States, 69 C. C. A. 61, 136 Fed. 53–56.

It is not directly alleged in the indictment that the stock of the mining company was not of the value for which it was to be sold by the defendants, or that the defendants did not believe, or have reasonable cause to believe, that it was of such value, or that the other representations to be made by them were in fact true. But the value of the stock of the mining company would depend either upon the producing capacity of the mine or its value as an undeveloped mining property. It is plainly alleged that it was not a producing mine and that it was only at the prospecting stage. When, therefore, it is further alleged, as it is, that the mine did not have ore in the quantity or of the quality, and that the shafts had not been sunk in it, both of which it is alleged was a part of the scheme of the defendants to falsely represent to prospective purchasers of the stock, it is sufficiently alleged that the stock of the mining company was not of the value that the defendants were to falsely represent it to be. These statements or representations so to be made were not mere matters of opinion, but were statements of fact, as to the quantity and quality of the ore in, and of the work that had been done upon, the mine upon which a reasonable estimate might be based as to the value of such stock or of the mining property which it represented.

Whether or not the defendants in good faith believed, or had reasonable grounds to believe, that the alleged statements or representations to be made by them were true, is matter of defense and not necessary to be negatived in the indictment. Lemon v. United States, 164 Fed. 953, 90 C. C. A. 617; Ewing v. United States, 136 Fed. 53, 69 C. C. A. 61; State v. Williams, 70 Iowa, 52, 29 N. W. 801; 1 Bishop's New Cr. Pro. §§ 326–513.

However, the indictment alleges that such representations so to be made were in fact false and untrue and known by the defendants to be so. This leaves no room for saying that they might honestly have believed that they were true, or that they might have had reasonable grounds for so believing. Such averment is a sufficient allegation, if it is necessary to be made, that the defendants did not in good faith believe, or have reasonable grounds to believe, that the representations to be made by them were true.

Finally it is urged that the denial of the truth of the alleged false representations consists at best of mere "negative pregnants," which are wholly insufficient to constitute a denial of such representations. This, if a defect at all, is one of form only or of the manner in which the denial is alleged. A negative, or affirmative, pregnant is a form of issue presented by a pleading in civil actions at common law in which a negative or affirmative allegation admits by implication of something favorable to the adverse party. Under the strict rules of common law pleading, such denials or affirmations were frequently held to be insufficient because they left it uncertain as to which of two or more matters the pleader intended to contest. The rule as such was inapplicable in criminal cases; but in those cases it was of course required that the indictment be direct and certain in charging the offense alleged to have been committed; and this is still the rule as to statutory offenses. To say, therefore, that an allegation in an indictment is but a "negative pregnant," is only to say that the allegation is indefinite or uncertain, which may or may not be a defect, depending upon the nature of the allegation and its relation to, or connection with, other allegations. While some of the negative allegations of this indictment, standing alone, may impliedly admit an affirmative of some matters, the allegations as a whole are a full and complete denial of the truth of all of the representations that defendants were to make respecting the stock and property of this mining company and sufficiently show the purpose of the defendants in offering such stock to the public for sale. There is no uncertainty as to the meaning of these allegations, and they sufficiently apprise the defendants of what they are required to meet and are sufficiently explicit to enable them to plead the judgment thereon, whatever it might have been or may be, in bar of a future prosecution for the same offense.

Section 1025 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 720) provides that:

"No indictment found or presented by a grand jury in * * * any court of the United States, shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant."

This of course is not to be construed as permitting the omission from the indictment of any matter of substance; but it is applicable where the only defect complained of is that some element of the offense is stated loosely and without technical accuracy. Dunbar v. United States, 156 U. S. 185–192, 15 Sup. Ct. 325, 39 L. Ed. 390. The true test therefore is, not whether the indictment might possibly have been made more certain, but whether it contains every element of the offense intended to be charged and sufficiently apprises the accused of what they must be prepared to meet, and, in case any other proceedings are taken against them for a similar offense, whether the record shows with accuracy to what extent they may plead a former acquittal or conviction. Cochran v. United States, 157 U. S. 286–290, 15 Sup. Ct. 628, 39 L. Ed. 704; Miller v. United States, 133 Fed.

337, 66 C. C. A. 399; Brown v. United States, 143 Fed. 60, 74 C. C. A. 214.

It is seldom that an indictment is drawn with such precision that some plausible objection may not be lodged against it upon an over-critical analysis of the same, or that it might not be improved in some particulars after a trial; but an examination of this indictment in the light of the objections urged against it convinces beyond any doubt that it charges with sufficient certainty the offense alleged to have been committed by these defendants, and that the demurrer to it was properly overruled.

Errors are assigned upon the admission of evidence over the objections of the defendants; among them, that a Mrs. Cross was permitted to testify that she made an arrangement with the defendant Frank H. Horn whereby she was to have a half interest in the profits upon 28,000 shares of canceled or forfeited stock of the mining company when it was resold by him, that she was to pay nothing for the stock, but when it was resold five cents per share were to go to the company, and she was to have one half of what it sold for above that and he the other half, that she had received some $562 as her share of the stock that had been resold but had paid nothing towards its purchase, and that she understood that some 15,200 shares remained unsold of the 28,000 shares. This testimony was admitted for the purpose of showing Frank H. Horn's method of dealing with the stock of the company, and it was properly admissible as against him for that purpose. It may not have been very material, but there was no error in its admission. Other errors assigned upon the admission of evidence in behalf of the government have all been considered, and it is sufficient to say of them that no substantial error was committed in this respect. The testimony objected to was admissible as to some one or more of the defendants and was properly admitted as to them.

The letters set out in the three counts of the indictment were each offered and admitted in evidence. It was admitted upon the trial that the letters were written by the defendants respectively whose names are signed to them; but it is urged that there is no evidence that the letters were deposited, or caused to be deposited, in the mails by said defendants, or, if mailed, that they were mailed in execution, or attempted execution, of the scheme laid in the indictment; also, that the defendants not signing the letters are not bound thereby. The person to whom each letter is addressed was produced as a witness and testified that he received the letter addressed to him through the mails at his place of residence, one in Saginaw, Mich., one in Pawtucket, R. I., and one in St. Louis, Mo., and that with the letter, and in the same envelope with it, were circulars and newspaper clippings describing the "Two Queens" group of properties; the work then being done in such mines and reports showing the condition of the mining company, some of which circulars and reports were signed by the defendant Frank H. Horn as the financial agent of said company, others by the defendant Snider as president, and also by the secretary of that company. The envelope in which these letters, circulars, and advertisements were inclosed is addressed to the person to

whom. the letter is addressed at his post office and bears the postmark of the post office at Kansas City, Mo., and the date it was posted, and a return card. directing its return, if not delivered within five days, to Mr. Frank H. Horn at Kansas City, Mo., in the case of the two letters written by him, and the other to the Southwestern Investment Company of Kansas City, Mo., of which company the defendant May was president. After the receipt of these letters with the circulars and advertisements contained therein, each of the persons so receiving them corresponded through the mails with the defendant, who wrote the letters at Kansas City, Mo., and purchased from him through such correspondence stock of the mining company and received from him through the mails certificates of the stock so purchased and receipts or acknowledgments for such payments. Together these are prima facie evidence that the letters set out in the indictment were mailed, or caused to be mailed, at Kansas City, Mo., by the defendant who wrote the same, on the date of the postmark appearing thereon. Stokes v. United States, 157 U. S. 187–191–192, 15 Sup. Ct. 617, 39 L. Ed. 667; United States v. Noelke (C. C.) 1 Fed. 426–444. And see Wigmore on Evidence, § 2152, and notes.

There was no error, therefore, in admitting in evidence the indictment letters and the envelopes in which they were received by the witnesses respectively. Whether or not the letters tended to connect these and the other defendants with the scheme laid in the indictment, or were mailed in execution or attempted execution of that scheme, was for the jury to determine. These letters, as well as other letters written by the defendants respectively, were properly admitted in evidence as bearing upon that question.

At the close of all of the testimony, each of the defendants requested the court to direct the jury to return a verdict in his favor, which request was denied and an exception saved. No ground was assigned, or suggestion made, as a basis for this request. The assignment of error based upon this ruling is that the court erred in overruling this request. The attention of the trial court not having been called to any ground upon which the request was made, this assignment might well be disregarded for this reason alone. It is urged, however, in behalf of each defendant, that there is no testimony that would warrant a verdict against him, or sustain one if found, and that a verdict should have been directed in his favor for this reason. In view of this the testimony has been considered. It is voluminous, and contains a great mass of printed matter consisting of circulars, newspapers, advertisements, reports of and concerning the "Two Queens" group of properties, the work alleged to be in progress upon those mines, and the condition and value of such property. This literature is signed, most of it, by the defendant Frank H. Horn as fiscal agent of the mining company, some of it by the defendant Snider as president of that company, and some of it by the defendant May, and all of it was sent out in the letters shown to have been written by the defendants Frank H. Horn as such fiscal agent, by the defendant Raymond P. May, and by John E. Horn, in his own name and that of Charles B. Rudd, to persons with whom they were in communication,

by means of such circulars and advertisements and in other ways, so-liciting and urging the purchase by them of the stock of this mining company upon the representations made in such literature.

The questions arising upon this branch of the case are: (1) Is the evidence of such a nature as to require that it be submitted to the jury? And if it is (2) is it sufficient to sustain a verdict against either defendant?

To do more than state some of the ultimate facts which the testimony tends to establish would unduly extend the opinion and aid but little in determining these questions. It appears that the Central Mining & Development Company was incorporated under the laws of Arizona by the defendants Frank H. Horn, S. H. Snider, and one G. H. Kriechbaum, in Los Angeles, Cal., July 27, 1906, with a capital stock of $10,000,000, divided into 10,000,000 shares of the par value of $1 each. Its articles were filed in the office of the territorial auditor of Arizona July 30th following. Article 3 provides that the capital stock of the company shall be paid up at the date of issuance, or at such time as the board of directors may designate, in money, property, labor, or any other valuable right or thing; and the judgment of the board of directors or managing officers as to the value thereof shall be conclusive. Article 4 provides that the general nature of the business in which the company shall engage, among other things, is "to locate, purchase, lease, or otherwise acquire, own, hold, control, oper-ate and conduct, sell or otherwise dispose of, and deal in, mines and mining claims and rights and all kinds of mining properties; * * * to purchase or otherwise acquire, own and sell its own stocks and bonds, and stocks and securities of other corporations. * * *" The corporation, therefore, was organized without any capital whatever, and the plain purpose of its organization was to embark in some enterprise whereby it could best unload upon the public its capital stock at the largest possible price. At the time of its organization, the defendant Frank H. Horn resided in Los Angeles, and so did the defendant S. H. Snider, and each was engaged in writing insurance for a fraternal insurance company, of which Frank H. Horn was state agent for California. For some time prior to August 15th Frank H. Horn and S. H. Snider had been negotiating with one S. D. Gardom for the "Two Queens" group of mining properties. Gardom was then in Los Angeles and had a claim of some sort upon this property. Frank H. Horn and Snider had represented to him that they had facilities for handling the same through the assistance of E. S. Horn, and the Horn-Baker Advertising Company of Kansas City, Mo. During these ne-gotiations, and apparently in the early days of August, a telegram was sent from Los Angeles to Kansas City inquiring about the financial standing of E. S. Horn and the Horn-Baker Advertising Company. The defendant E. S. Horn at that time was, and since has been, a member of the Horn-Baker Advertising Company of Kansas City and lived in that city, and his brother John E. also lived there. August 11, 1906, E. S. Horn and his brother John left Kansas City for Je-rome, Ariz., to investigate, as E. S. Horn says, a mining property there in which John E. was interested; that they went by way of Los An-

geles to visit their brother Frank, whose wife was then sick, and arrived at Los Angeles the evening of August 14th. He also says. that immediately upon their arrival his brother Frank, to whom he had telegraphed that he was coming, met them at the train and told them of the "Two Queens" group of mining properties; that he met Gardom and Snider the next morning, and had several conversations with them, that morning and later, at the office of his brother Frank and at his house about the "Two Queens" properties, and "they asked me what the possibility was of its stock selling, and I explained to them the different methods of stock selling by agents soliciting and advertising as known to me. I was more familiar with advertising; that was what I knew especially about. I remember that Mr. Gardom talked to me regarding the capitalization of the company, that it was his impression that this charter, which had been taken out something like a month previously, was too high, that he would—that he suggested that it be reduced to $5,000,000, instead of $10,000,000, and asked me my opinion about it. I told him that I was of the impression that the public would buy stock in a $10,000,000 corporation at 5 cents a share more readily than they would in a $5,000,000 corporation at 10 cents, and as the final result was the same to the mining company and the stockholders, and as the charter was already prepared, I would not disturb it. I had some further talk with them about the properties and about advertising, but made no arrangements about advertising while I was in California."

August 30, 1906, the defendants Frank H. Horn and S. H. Snider entered into a written contract with S. D. Gardom, and one C. G. Werner, as the owners of the "Two Queens" group of mining properties, whereby it was agreed, among other things, that Gardom and Werner would convey said "Two Queens" group to the Central Mining & Development Company, and receive 5,200,000 shares of its capital stock for said properties, to be divided between them as they might agree. Of the remaining shares 4,000,000 were to be set apart as treasury stock of that company, 300,000 shares were to be delivered to the defendant Frank H. Horn and others as promotion stock, and 500,000 shares were to be placed in escrow for the benefit of Frank to be delivered to him as part of his compensation upon condition that he pay within six months to the corporation or into its treasury not less than $5,000 on account of sales of stock thereof, and some other conditions not material to now notice. It was further agreed that Frank H. Horn was to act as the fiscal agent of the corporation and was to have the exclusive right to sell its treasury stock, and was to receive as his compensation therefor a commission of 50 per cent. upon the gross amount of the sales made by him of such stock; that defendant S. H. Snider was to act as president of the corporation, and Gardom was to be superintendent of mines. September 4, 1906, a contract was entered into between said S. D. Gardom, C. G. Werner, and the defendant Snider wherein the contract between Gardom, Werner, and Frank H. Horn was referred to and approved. It was further provided, among other things, that the defendant Snider should receive 1,300,000 shares, or one-fourth, of the 5,200,000 shares allotted to Gardom and Werner, upon his paying $3,000 therefor. This is the

nearest approach to the value of this mining property shown by the evidence, which the managing officers of the company, of whom Frank H. Horn and Snider were two, conclusively fixed for the future stockholders of the company at $10,000,000. E. S. Horn returned from Los Angeles to Kansas City in the early days of September, 1906. On his return he learned of the contract between Gardom, Werner, and Frank H. Horn of August 30th, examined it carefully, and on or about September 10th upon the strength thereof made a contract in the name of the Horn-Baker Advertising Company with his brother Frank as fiscal agent of the company, who had then returned to Kansas City, to do the advertising for it, for which he was to receive 100,000 shares of the promotion stock of the company for extending credit to it on such advertising; that the Horn-Baker Company prepared and placed the advertising matter of the company to the value of about $31,000, which included much of the printed literature offered in evidence; that such sum was paid by Frank from and was the amount of his commissions on the sale of treasury stock above his office expenses. On this amount E. S. Horn, or the Horn-Baker Company, received a commission of $4,000 from the publishing concerns with which the advertising matter was placed; that E. S. Horn also received the 100,000 shares of the promotion stock as agreed, and later received 75,000 shares more from Frank Horn, which he returned to him, and 75,000 shares from Snider without other consideration therefor which he retained; and that of this entire stock he sold some 75,000 shares, 60,000 of which he sold through the defendant May of the Southwestern Investment Company. The advertising agency, according to the defendant E. S. Horn, is the go-between between the advertiser and the publisher. The agency seeks or procures the advertiser, ascertains from him the nature of his advertisement, prepares it in proper form for, and secures its publication, collects of the advertiser therefor, pays the publisher, and receives from the latter a commission as its compensation. There is much other testimony tending to show the connection of the defendant E. S. Horn with this mining company in the early stages of its organization and before the contract of August 30, 1906. Of the connection of the defendants Frank H. Horn and S. H. Snider with the mining company in its inception, that they fully knew the purpose of its organization of its plan to unload its stock upon the public, and that it was organized without any capital in fact admits of no doubt.

The foregoing statement of the connection of E. S. Horn with this company is condensed largely from his own testimony. All of this testimony tends to show that defendant E. S. Horn was equally as well advised of the purpose and plans of the promoters of the mining company as Frank H. Horn and Snider were; that he advised in the formation of the same, urged that its capitalization remain at $10,000,000, upon the ground that in his judgment this would facilitate the sale of its stock to the public; and that he undertook to aid in the disposition of such stock as early as September 10, 1906, when he entered into the contract with Frank H. Horn to prepare the advertising matter for the company, and which he later did prepare or cause to be prepared and procured its publication to aid in effecting the sale of its stock.

The connection of the defendant May with the mining company and the sale of its stock begins at a date later than September 10, 1906, and it is contended in his behalf that he could not have been a party to the scheme as laid in the indictment because it conclusively appears that that was formed, if at all, in the latter part of August or early in September, 1906, and that his connection with the company and the sale of its stock was not earlier than January 15, 1907, the date of his letter to John J. McKelvey attached to the third count of the indictment. The indictment was found and returned November 11, 1908, and if the defendant May became a party to the scheme, or knowingly adopted the same, at any time before that date he would become a party thereto at the date that he so knowingly adopted the same. The testimony conclusively shows that May began offering for sale the stock of the "Two Queens" group of properties as early as January 15, 1907; that on that date he signed and caused to be mailed to the witness McKelvey at Pawtucket, R. I., the letter attached to the third count of the indictment. That letter, among other things, contains the following:

"Southwestern Investment Company.

"Capital $10,000.00

"Stocks, Bonds and Securities.

"Century Building, Kansas City, Missouri.

"References: Bankers' Trust Co. of Kansas City.
   "Gate City Bank of Kansas City.

"Jan. 15, 1907.

"Mr. John J. McKelvey, Pawtucket, Rhode Island—Dear Sir: I am in the business of helping my clients make money, and the more they make the more I make. * * *

"You probably read a few weeks ago of the wonderful gold strike made at the Two Queens group of mines in Pinal county, Arizona—gold ore assaying $200,000 to the ton, and in such quantities as to amaze the oldest and most experienced mining men, who all agreed that no richer strike had ever been made in the territory. Probably you also read of the frenzied stampede to secure holdings of Two Queens stock as soon as the news of this magnificent strike became known. The company's offices were simply flooded with orders —letters poured in from all parts of the United States—and the limited allotment of treasury stock set apart for public subscription was swept from the market like a field of ripe grain before the hurricane.

"The directors of the Central Mining & Development Company at their last meeting authorized the sale of another small block of a limited number of shares of stock, which will be placed on the market January 25th at the price of twenty-five cents per share. This allotment of stock will be swept from the market just as rapidly as the allotment that was recently offered at fifteen cents per share.

"A client of mine, who was fortunately able to secure several blocks of Two Queens stock, now finds himself compelled by unforeseen circumstances to realize immediately upon his investments and has therefore placed in my hands his entire holdings, which I am now offering to a few of my correspondents at only fifteen cents per share—the same price that was paid for it. This stock must be turned into cash at once, and therefore in order to take advantage of the opportunity it will be necessary for you to place your order immediately upon receipt of this letter. I have not half enough of this stock to go around among those who will want it; but I am under positive contract to sell to the first comers, and only those who act promptly will stand any chance at all of securing it.

"I hope you will appreciate the full significance of this offer, and for this reason I want to pledge you my word and good faith, that with the exception

of the Mansfield, I have never seen an investment of any kind which I could so unqualifiedly recommend to my clients. The Two Queens group of mines is undoubtedly destined to take its place among the richest and most famous gold producers on the American continent; and I confidently expect to see its stock selling at several dollars per share in the early days of the future. Were it not for the fact of my other large interests, which have taxed my full resources, I should have purchased and held this block of stock on my own account; but under the circumstances I know that the best use I can make of these shares is to distribute them among my clients, trusting simply to be favored with the continuance of your patronage after you see each and every one of my predictions fully and completely fulfilled.   *   *   *

"An investment in Two Queens stock offers you an opportunity to obtain a share in a gold mine whose prospects, at the very outset, were many times brighter than those of any of the great properties mentioned above ever were, and whose every step of development work has but brought new confirmation to the first judgment of its owners.

"With thousands and thousands of tons of rich ore only waiting to be removed, and with the work of opening up and developing this wonderful property being pushed forward with all possible speed, it is not surprising that authorities on the subject of mining investments are declaring Two Queens stock to be one of the greatest money-making opportunities now before the public.

"I would especially invite your attention to the inclosed assay certificates, which show gold values on the Two Queens property running all the way from $42.79 to $200,000 to the ton. These assays were made by some of the most competent experts in the United States, who had no interest in the matter except to state the facts. This ore was taken out at point after point from great ledges that can be traced for distances of from 300 to 3,000 feet running through the company's property. Moreover, according to the engineers and experts who have examined them, and as proved by the large amount of development work already done on the Two Queens, these rich veins widen and enlarge with depth. The silver and copper values alone should be sufficient to cover all expenses of mining.

"The management of the company is in safe hands—not stock jobbers, but experienced mining and business men of unquestioned ability and standing. The stock is fully paid and nonassessable, par value $1.00.

"If you want a portion of this stock, I would advise you to write at once, or better wire me to make sure, letting full cash payment follow by mail.

"Sincerely yours,              Raymond P. May, President.
                     "Southwestern Investment Company."

Inclosed with this letter was some of the printed literature of the mining company purporting to show the extent and condition of the "Two Queens" group of properties. McKelvey later purchased of May stock of the mining company and paid him therefor. A number of other letters were afterwards written by May to different persons offering to sell, and urging the purchase of the stock of the "Two Queens" group, inclosing to them the advertising literature of that company, and a number of the persons receiving such letters purchased the stock of that company after receiving the same and paid him therefor. That apparently intelligent persons should invest their money in a mining prospect of which they had no knowledge whatever, save from such literature, upon such exaggerated and alluring promises of present and prospective values as are contained in this letter of January 15th, and other letters of similar nature, but verifies the observations of Mr. Justice Brewer in Durland v. United States, above, where he says:

"It is common knowledge that nothing is more alluring than the expectation of receiving large returns on small investments. Eagerness to take the chances of large gains lies at the foundation of all lottery schemes, and, even when the

matter of chance is eliminated, any scheme or plan which holds out the pros-pect of receiving more than is parted with appeals to the cupidity of all. In the light of this, the statute must be read, and so read it includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future. The significant fact is the intent and purpose. * * * "

The defendant May testified that he purchased some of the stock of the mining company himself but that he was unable to state what amount or what he paid for it; that he sold some or all of this stock, also some for Frank H. Horn, and E. S. Horn, selling some 40,000 shares for the latter; that in the latter part of May or early in June, 1907, he visited the mine and made a personal inspection of the same, and on June 18th embodied in a report of that date over his own sig-nature the condition of the mine as he claims to have found it upon this inspection. This report is copied in full by the defendant Frank H. Horn as fiscal agent of the mining company in a circular letter by him describing the condition of the "Two Queens" group as the state-ment of a disinterested person of the condition of the property. May says that Frank H. Horn, E. S. Horn, and the defendant Snider were present at the time that he inspected the mine, and that he got from them most of the information regarding its condition as stated by him in this report. This report was sent out by him through the mails to those to whom he offered the stock of the "Two Queens" property for sale and urged its purchase by them. He also published, or caused to be published, what is called in the testimony "The Investor's Guide," in which the stock of the "Two Queens" mining property, and a num-ber of other mining properties in which E. S. Horn is interested as a stockholder, is advertised for sale. He says that all this literature so published was prepared by the copy department of the Horn-Baker Advertising Company, that he signed it, had it published, and sent it out as a part of the literature of his company, and also sent out the literature of the "Two Queens" mining stock prepared for and signed by Frank H. Horn as fiscal agent of the mining company. His atten-tion was called to his letter of January 15th and to the statement therein as follows:

"A client of mine who was fortunately able to secure several blocks of Two Queens stock, now finds himself compelled by unforeseen circumstances to real-ize immediately upon his investments and has therefore placed in my hands his entire holdings, which I am now offering to a few of my correspondents at only fifteen cents per share—the same price paid for it. * * * "

And was asked: Who was the client referred to in this paragraph of his letter? He answered:

"Probably Frank H. Horn's stock."

He also said that he did not prepare this letter, but that it also was prepared by the copy department of the Horn-Baker Advertising Com-pany and signed and sent out by him. Referring to the statements of his letter dated May 11, 1907, he says he got all his information there stated from Frank H. Horn with whom he had become well ac-quainted. The foregoing has been condensed largely from the testi-mony of Mr. May himself. There is much other testimony tending to connect him with Frank H. Horn in the sale of the stock of the

"Two Queens" group of properties from and after January 15, 1907; also with the defendant E. S. Horn in this and other mining properties. Without reviewing the testimony more in detail, it is sufficient to say that it convinces beyond any doubt that it is ample to require that it be submitted to the jury as against this defendant.

Under this branch of the case, it is urged that there is a fatal variance between the allegations of the indictment and the proofs.

But this question was in no manner raised in the trial court, and that court of course did not rule upon it. It is not, therefore, properly before this court for determination. An examination of the record, however, convinces that there is no material variance between the proofs and the allegations of the indictment.

It is also urged that each of the defendants honestly believed that the representations made by him respecting the value of the "Two Queens" mining properties, were true, or that he had good grounds to believe they were true, and that the evidence so shows. It may be conceded that, if the defendants or either of them so believed or had reasonable grounds to so believe, that would be a good defense to the one so believing or having such grounds of belief. Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709; Rudd v. United States, 97 C. C. A. 462, 173 Fed. 912.

A representation made by means of letters or circulars sent through the mails may be so obviously without foundation in fact as to afford ample evidence of a criminal intent. Nevertheless, if the representation is made upon an honest conviction of its truth, or upon facts affording reasonable grounds to believe that it is true, it does not aid in effecting a scheme to defraud. Whether or not such representations are false, or, if false, were made with an honest belief that they were true, is a question of fact, even though the representations may be such as to evince to an intelligent mind their untruth. Each of the defendants testified that he believed the representations made by him to be true; but this is not conclusive, and there was an abundance of other testimony that the value of the mining property, and other facts within the actual knowledge of each defendant, were such that he could not honestly have had any well-grounded belief that the representations made by him as to the present or prospective value of the property were true. The question, therefore, was one for the jury.

A careful and patient consideration of the entire testimony, in the light of the objections urged against its sufficiency, forces the conclusion that it would have been error to have withdrawn it from the consideration of the jury, and that it is amply sufficient to sustain the verdict against each of the defendants. There was no error, therefore, in denying the requests for an instructed verdict in their favor.

The question remains: Did the court err in its charge to the jury, or in refusing to give requests asked by the defendants?

The requests asked by the defendants, so far as they are correct, were either given as requested or are substantially embodied in the general charge of the court. There is no merit, therefore, in the assignments of error based upon the refusal of the requested instructions.

182 F.—47

Error is assigned upon a portion of the charge which is as follows:

"The law is a sensible and a practical thing. It requires to maintain an indictment of this character proof of the substantial, essential facts constitutive of the offense. It doesn't necessarily require exact and specific proof as to each detailed statement in the indictment, but it will be sufficient if sufficient substantive proofs constitutive of the offense have been established to your satisfaction. * * * It will also be sufficient, to sustain the allegation of this indictment in its substantive effect, if, as a matter of fact, 500,000 shares of treasury stock was to go into the hands and control of E. S. Horn, and that he did so receive it according to the understanding and plan between the parties."

The indictment does not allege that portions of the treasury stock were to be divided between the defendants, but that the promotion stock was to be so divided. The paragraph mistakenly states that the indictment alleges that 500,000 shares of the treasury stock were to be turned over to E. S. Horn, when it was Frank H. Horn who was to receive 500,000 shares of the promotion stock. This is so plainly a mistake in the name of the Horn who was to receive the 500,000 shares of stock, and the kind thereof, that it could not possibly have misled the jury, for the allegations of the indictment and the proofs leave no room for doubt upon that question; besides, the exception does not direct the attention of the court to this mistake, which, had it been done, would undoubtedly at once have been corrected, for the court in a previous paragraph had correctly stated the allegations of the indictment in this respect. The mistake obviously arose from the second request asked by defendants in which Elisha S. Horn is mistakenly referred to as the fiscal agent of the company. The mistake was therefore invited by the defendants, and they cannot rightly complain of it. The other portions of the paragraph are substantially correct.

The court charged the jury as follows:

"But law and public policy require that there should be some reasonable relation between the value of the corporation and stock issued therein. In other words, the value of the stock as an actual thing must depend upon the value of the property upon which the stock is issued. So that, while it is to be conceded when purchasers bought that stock at 10, 15, and 20 cents they knew the venture was largely speculative, yet if, in order to induce them to invest their money in said stock, the promoters of the enterprise knowingly, or without knowledge of the truth thereof, made false material statements of facts, highly exaggerated, for the purpose of inducing persons buying the same on the faith thereof, as already stated to you, they have crossed the line of legal permissibility as to the statements of fact not known to be true, or which the party had no good reason to believe were true. That would take the case out of the protection of justifiable commendation of stock for sale.

"The law indulges a reasonable degree of what is commonly known as 'puffing' one's property, in order to induce buyers to take it at the highest price obtainable. The vendor may commend an article or property he has to sell by expressing his opinion of its value, present or prospective. But this right has its proper limitation. Where promoters conceive the idea of exploiting for sale stocks of the association in which they become interested by the use of the postal department of the United States, they should see to it that the statements made by them in letters, circulars, or other literature sent out by them as matters of fact within their knowledge, the facts of which are not known to those who are thus induced to become purchasers, are true. If they express material opinions and facts respecting the character of the property known to them to be false, which they have no reasonable information to be-

lieve to be true, such is more than a mere commendation of what they offer for sale. And if they so consciously lead the purchaser to buy, in reliance upon such statements, they practice a deception, which purpose they have no right to employ the post office department to accomplish. In other words, there is nothing about the exploitation of mining stocks that exempts the promoters from the obligations of honest dealing which the law imposes upon all men in the vending of any property. * * * A party has no more right to state positive facts about the character of mining property, or what it has produced and what it is producing, than he has in the representation of any other property in which he deals if those facts are not known to be true, and are not true.

"While in some portions of the letters and circulars before you there are permissible expressions of opinion, there are in many of the letters and advertising literature sent out through the mails to induce intending purchasers to buy stocks material assertions of existing facts respecting the condition and quality of said mine, what had been discovered and seen about its output, assays made, and shipments of ore therefrom, or to be made, and the like. If you believe and find from all the evidence and circumstances developed before you that such statements were not true, were not known to the authors of them to be true, and they had no reasonable ground to believe such statements were true, and that the organizers of said mine under said corporate name had in mind at the time of so exploiting the sale of its stock by use of the post office department of the United States in furthering such exploitation, and in pursuance thereof the defendants deposited in the post office department, or caused to be deposited therein, such letters or literature as that set out in the indictment, as sent to such addresses, such would constitute a scheme or device to obtain money from others by fraudulent means, and such acts in furtherance thereof would constitute a violation of the statute.

"It is not essential to the conviction of all the defendants that you should find from the evidence that in the inception of the alleged scheme or device all of them were present, conniving at, participating in, or consenting to such conception and design; but if such scheme or design was conceived by any of them, with such fraudulent intent aforesaid, and afterwards, during the existence and promotion of such scheme and purpose, any of the other defendants knowingly entered into and participated as aforesaid in its furtherance and promotion, they would be equally as responsible to the statute."

This was excepted to as follows:

"The defendants except to that part of the charge which is to the effect that if statements were not true, or not known to be true, or the defendants did not have reasonable grounds to believe them to be true, the jury might, in connection with other facts, find that the defendants entered into a scheme to defraud."

This exception is without foundation, for the court did not so charge. It is urged in behalf of the defendants under this exception that even if the representations alleged and shown to have been made by them as to the mining property and the amount and quality of the ore therein were in fact untrue, or not known by them to be true, yet, if they had reasonable grounds to believe them to be true, they could not rightly be convicted of having formed a scheme to defraud, because of such representations, which was to be effected by the use of the United States mails. Conceding this to be a substantially correct statement of the law, we think the jury was, in substance, so charged. The jury was plainly told, "If you believe and find from all of the evidence and circumstances developed before you that such statements (referring to those claimed to have been made by the defendants) were not true, were not known to the authors of them to be true, and they had no reasonable grounds to believe that such state-

ments were true," and they found the other facts as stated, they would be justified in finding that the defendants had formed a scheme to defraud, which, if it was to be effected by the forbidden use of the United States mails, would be a violation of the statute. Excerpts from the charge standing by themselves and apart from the rest of it may be vulnerable to some of the criticisms urged against them; but that is not the proper test of the correctness of the charge. That must be considered as a whole, and, so considered, we think that it is not subject to any of the objections urged against it. The charge as far as it goes is certainly not erroneous. It might have been more specific, but the defendants did not request this. If they desired a more specific charge upon this feature of the case, they should have requested it; they did not do so, and the assignment of error based upon the exception saved to it cannot be sustained.

Some other errors are assigned and urged upon us that are not specifically mentioned in the foregoing opinion, but they have all been considered; and it must suffice to say that they are deemed to be without substantial merit; also, that the record shows beyond any doubt that no prejudice resulted, or could have resulted, to either of the defendants from any of the errors alleged to have occurred during the trial.

The conclusion therefore is that the judgment as to each of the defendants must be affirmed, and it is, accordingly, so ordered.

Affirmed.

SANBORN, Circuit Judge (dissenting). I am unable to divest my mind of the conclusion that the trial court missed the crucial issue in this case and erroneously instructed the jury that they might convict the defendants without any proof or finding that they did not believe the representations which they made if the jury found that they had no reasonable cause to believe them. An intent to deceive by their representations, an absence of belief that their statements were true, was indispensable to a lawful conviction of the defendants of the crime with which they were charged. The facts that their representations were false, that they were calculated to deceive, and that the defendants had no reasonable cause to believe that they were true, might have charged them with liability for civil damages; but these facts constituted no criminal offense and established no guilt if the defendants honestly believed that the statements and representations which they made were true. "The significant fact," said Mr. Justice Brewer, "is the intent and purpose. The question presented by this indictment to the jury was not, as counsel insist, whether the business scheme suggested in this bond was practicable or not. If the testimony had shown that this Provident company, and the defendant, had entered in good faith upon that business, believing that out of the moneys received they could by investment or otherwise make enough to justify the promised returns, no conviction could be sustained, no matter how visionary might seem the scheme." Durland v. United States, 161 U. S. 306, 313, 16 Sup. Ct. 508, 511, 40 L. Ed. 709. In other words, no matter how little reasonable cause to believe his representations are

true a defendant had, he was not guilty of the crime of using the mails to defraud if he did honestly believe his statements were true.

The values of mines and mining stocks are generally unknown. Those values are concealed in the ground and at the times of most of the sales of the mines and the stocks are unknowable. Such stocks and mines are sold and bought upon hope and faith, and not upon facts or reason. It would probably be a conservative statement to say that three-fourths of those who sell and buy them have no reasonable cause to believe that they control the ores or the values which they represent them to possess, or are worth the prices which they respectively receive and pay for them. Yet these dealers are not generally criminals and do not intend to defraud each other although they represent and believe what they have no reasonable cause to believe and what the vast majority of citizens cannot believe on the evidence which is presented to them. Such men are simply more credulous and sanguine than the majority of mankind. In Rudd v. United States, 97 C. C. A. 462, 463, 173 Fed. 912, 913, the defendant used the mails to make false representations that were clearly contrary to familiar fundamental physical laws, representations that no one could have any reasonable cause to believe to be true. The trial court in effect told the jury that the defendant must be guilty because he could have no reasonable cause to believe that his machine was practicable, or that his representations were true. But this court reversed the judgment and said:

"The main defense was that, though the machine may have been impracticable, the accused honestly believed in its efficiency, and that what he did was without intent to defraud. Of course if this was so there was no violation of the law which was designed to prevent the use of the post office in intentional efforts to despoil. Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709. A representation may be so obviously without foundation as to afford cogent evidence of the criminal intent in him who makes it; but, nevertheless, if in fact it proceeds from honest ignorance or delusion, it does not help to make a scheme to defraud within the statute. * * * Whether conduct which is made the subject of a criminal charge results from a credulous self-deception, or, on the other hand, evinces a design to defraud the public, is a question for the determination of the jury; and it is none the less so, though the truth of the matter may be clear to most intelligent minds. That so many projects, which to the discerning are manifest schemes for spoliation meet with success and find victims among honest well meaning people, shows how futile it is to attempt to define the bounds of human credulity."

The defendants in this case testified that they believed the representations they made to be true, and the crucial question in this case was whether, on the one hand, they did so believe and honestly made these representations, or, on the other hand, knew or believed them to be false and made them to defraud. This, the controlling issue in the case, the court entirely withdrew from the consideration of the jury, and charged them that they might convict without determining this issue. It said: "If you believe and find from all of the evidence and circumstances developed before you that such statements (referring to those claimed to have been made by the defendants) were not true, were not known to the authors of them to be true, and they had no reasonable grounds to believe that such statements were true," and they found the other facts as stated, they would be justified in finding that

the defendants had formed a scheme to defraud which, if it was to be effected by the forbidden use of the United States mails, would be a violation of the statutes. The error was in instructing the jury that they might find the defendants guilty of the scheme charged without finding that they believed that their representations were false.

The exception appears to me to clearly point out the error. It was in effect that the facts which the court had told the jury constituted the offense were insufficient to do so. It reads:

"The defendant excepts to that part of the charge which is to the effect that if statements were not true, or not known to be true, or the defendants did not have reasonable grounds to believe them to be true, that the jury might, in connection with other facts, find that the defendants entered into a scheme to defraud."

The error thus challenged was fundamental. It lay under the whole case and necessarily resulted in a conviction of the defendants without a finding of the indispensable fact that they did not honestly believe their representations to be true. In Pritchett v. Sullivan, 182 Fed. 480, 104 C. C. A. ——, this court held the following exception sufficient:

"The defendants except to all that part of the instruction concerning the right of police officers to arrest without a warrant."

The exception in this case is much more specific, and it seems to me to be sufficient under the rule that, where a basic error has been committed, an exception is ample which calls the attention of the court to the part of the charge which treats of the subject without quoting its exact words in full. Edgington v. United States, 164 U. S. 361, 364, 365, 17 Sup. Ct. 72, 41 L. Ed. 467; Felton v. Newport, 34 C. C. A. 470, 473, 92 Fed. 470, 473. The error to which attention has now been called was so radical that it seems to me clearly to have deprived the defendants of a fair trial of their case according to law and to entitle them to a new trial of this suit.

Each count of the indictment contained averments that it was a part of the scheme to defraud that Elisha S. Horn should conduct the advertising department for the mining and development company and "in return therefor should receive in money 50 per cent. of the moneys received from the sale of stock in said Central Mining & Development Company, and should also receive as a bonus and as additional remuneration 100,000 shares of stock in said company out of the 800,000 shares of promotion stock aforesaid. Of the balance of said 800,000 shares Frank H. Horn was to receive 500,000 shares as the so-called fiscal or financial agent of said company." The court instructed the jury in this way:

"It will also be sufficient, gentlemen of the jury, to sustain the allegation of the indictment in its substantial effect, if, as a matter of fact, 500,000 shares of treasury stock were to go into the hands of E. S. Horn, and he did so receive it according to the understanding and plan between the parties."

The exception to this portion of the charge was:

"They (the defendants) except to that part (of the charge) which directs the jury that it will be sufficient if the treasury stock only was to go to E. S. Horn and not necessary to be proven that E. S. Horn was to get half of the money derived from the sale of the stock."

E. S. Horn was on trial for the offense of conspiring to carry out the alleged scheme and to receive 50 per cent. of the moneys obtained from the sale of the stock of the company and 100,000 shares of the promotion stock. No evidence had been presented to sustain the charge that he was to receive, or ever had received, any part of the money secured by the sale of the stock of the company, or that he had ever received 500,000 shares of its stock. The evidence was that he had received 100,000 shares of the promotion stock for his service in advertising the stock of the company, and that the defendants Snider and Frank Horn had given him 150,000 shares of their stock on account of his service. The charge of the court upon this subject was therefore clearly erroneous because it instructed the jury that E. S. Horn might be found to have done a material act with which he had never been charged, to wit, to have received the 500,000 shares of stock, and because it informed them that they might find that he had committed the act with which he was charged; that is to say, the receiving of one-half of the money obtained from the sale of the stock of the company in the absence of any evidence whatever of that fact. There can be no question that an error was committed. Did the defendants invite this error by their second request? That request was:

"The court charges the jury that the scheme laid in the indictment is substantially that through the sale of stock in the corporation, such stock being treasury stock, the defendants arranged among themselves to obtain money from others through false and fraudulent representations to be made under the guise of a fiscal agency in the defendant Elisha S. Horn, and to divide such money or some part of it among themselves; that such scheme must have been proven as laid in the indictment; that there is no evidence that such was the scheme, and the jury must acquit the defendants."

But the only suggestion in this request that might be misleading was that the scheme was to be effected "under the guise of a fiscal agency in the defendant Elisha S. Horn," and that suggestion in no way invited a charge that Elisha S. Horn, or any other defendant, could be convicted of the offense with which he was not charged, or of which there was no proof. On the other hand, this request contained an express invitation to instruct the jury "that such scheme must have been proven as laid in the indictment." Moreover, the court below, as it seems to me, could not have been misled by this request because it refused to give it, or to give its equivalent, and because after it had given the erroneous charge that the averments against Elisha S. Horn might be sustained without proof that he received any of the moneys which he was charged by the indictment with receiving from the sale of the stock of the company its attention was specifically called to its error by the exception to it, and it still refused to correct it. Was this charge an immaterial mistake of the name of Elisha S. Horn for that of Frank Horn which could not possibly have misled the jury? If it was a mistake of the court, it was one which so clearly and radically misled the judge that he could not be persuaded to correct it, but persisted in and reaffirmed it when the defendants, by their exception, sharply challenged his attention to the fact that the charge against Elisha S. Horn was the taking of one-half of the money secured by the sale of the stock, and that it was error to instruct that this charge

could be established without proof that he had intended to take or had taken any of this money. The legal presumption is that error produces prejudice. It is only when the fact so clearly appears as to be beyond doubt that an error challenged did not prejudice and could not have prejudiced the complaining party that the rule that error without prejudice is not ground for reversal can have effect. Deery v. Cray, 5 Wall. 795, 807, 808, 18 L. Ed. 653; Peck v. Heurich, 167 U. S. 624, 629, 17 Sup. Ct. 927, 42 L. Ed. 302; National Masonic Acc. Ass'n v. Shryock, 20 C. C. A. 3, 11, 73 Fed. 774, 781; Railroad Company v. Holloway, 52 C. C. A. 260, 114 Fed. 458. The error certainly misled the trial judge and produced prejudice against the defendants in his charge. When his attention was called to it by the exception, he did not correct it, but was still misled by it, and the defendants were still prejudiced by it, and it seems to me to be far from certain beyond doubt that every juror in the panel disregarded the error the court instructed them to make and thereby saved the defendants from all prejudice therefrom.

Over the objections and exceptions of the defendants, the United States was permitted to prove that, while the defendant Frank Horn was, in the spring and summer of 1907, engaged to be married to Mrs. Cross, he sold to her 28,000 shares of stock of the mining and development company which had theretofore been sold by the company to third parties who had paid a part of the purchase price thereof, and had then defaulted, and that the terms of the sale to Mrs. Cross were that she should pay out of the proceeds of the resale that was to be made by Horn 5 cents per share, and the remainder of the proceeds should be divided equally between them. In my opinion this evidence was neither material nor relevant to the issues in this case; it had no tendency to prove or disprove any averment in the indictment, but wrongfully to influence the verdict by fastening the attention of the jury upon interesting but irrelevant issues.

For the reasons which have been stated, and others of a similar nature which it would be useless to set forth at length, the defendants in my opinion have not had a trial of their case according to the law and the evidence, and I am unable to consent to the affirmance of the judgments against them.