MOSES v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. March 9, 1915.)

No. 220.

1. POST OFFICE ⊛⇒48 — FRAUDULENT USE OF MAILS — INDICTMENT — SUFFICIENCY.

An indictment charging that accused had devised a scheme or artifice to defraud, that the scheme was to sell a device called an oxypathor upon representations that it would beget a supplementary breathing through the skin and membranes, that it increased the amount of oxygen

consumed by the body, had the direct effect of increasing vital combustion and the circulation, caused the body to attract oxygen from the air, and that by the proper use thereof the owner was absolute master of disease in all acute affections and in far advanced stages of the most formidable chronic diseases, that the scheme was to sell such device by means of such representations, and by means of letters and advertisements sent through the mail, that accused knew these representations to be false, that the oxypathor was in fact wholly powerless and lifeless, and incapable of any of such results, and entirely useless for any purpose, except to sell, and that as a part of the executing of such scheme, and in attempting so to do, accused feloniously and knowingly caused to be delivered by mail a letter therein set forth, which gave instructions to an agent as to methods of effecting sales, and which it was charged, was delivered through the mail, charged an offense under Cr. Code (Act March 4, 1909, c. 321) § 215, 35 Stat. 1130 (Comp. St. 1913, § 10385), providing that whoever, having devised a scheme or artifice to defraud, shall for the purpose of executing such scheme, or attempting so to do, place any letter, etc., in any post office, letter box, etc., to be sent or delivered by the post office establishment, shall be punished as therein provided; the contention that the mailing of the letter was not for the purpose of executing the scheme being untenable.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 67–80; Dec. Dig. ☞48.]

**2.** Post Office ☞49—Fraudulent Use of Mails—Elements of Offense.

Under such indictment, evidence showing that the representations as to the oxygen-increasing effects of the oxypathor were false, and believed by accused to be false, justified a verdict against him, without evidence that the device was absolutely worthless as a cure for diseases, whether or not accused would have made as large sale if he had merely' represented the oxypathor as a cure-all.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☞49.

Nonmailable matter, see note to Timmons v. United States, 30 C. C. A. 79; McCarthy v. United States, 110 C. C. A. 548.]

**3.** Criminal Law ☞1169—Appeal and Error—Harmless Error.

On a trial for using the mails in aid of a scheme to defraud in connection with the sale of oxypathors, where accused was allowed to call a great number of witnesses, who rehearsed at great length the narrative of their ailments, their use of the oxypathor, the cure or great improvement that followed its use, and their firm conviction that it gave them relief, which they had been unable to obtain otherwise, and numerous doctors testified with reference to specific cases concerning the beneficial effects of its use, and the symptoms following its use, and letters from persons not called as witnesses, giving their experiences and commending the instrument, were received in evidence, and the physicians testifying for the government did not merely express a general condemnation of the instrument, but testified specifically that circumstances narrated gave no indication that the oxypathor contributed anything towards effecting a cure, the exclusion of a question asked a physician as to whether in his opinion, from his knowledge and experience as a physician and with the oxypathor, it was of therapeutic value in the treatment of diseases, and the allowance or disallowance of other individual questions to professional witnesses, was not prejudicial error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 754, 3088, 3130, 3137–3143; Dec. Dig. ☞1169.]

**4.** Criminal Law ☞483—Evidence—Testimony of Experts—Hypothetical Questions.

On such trial, though a question asked a witness for the government, who had been in court throughout the trial, and had read the testimony taken out of court and read to the jury as to what function, if any, the

oxypathor had in the cure of the diseases mentioned, having in mind the testimony he had heard and read, was somewhat general, and though it might have been error to admit a general answer, that there was nothing in any of the cases to indicate that the device had any curative effect, no error was committed, where the witness analyzed the different cases in which it was claimed the device had a beneficial effect, grouping together those in which the patients' narratives described no pathological condition or identifiable disease, those in which the facts stated indicated some infectious disease, and those in which the presence of other diseases which he enumerated and described were indicated, and as to each group gave the reasons why, in his opinion, the device accomplished nothing which would not have been accomplished without its use.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1071, 1075; Dec. Dig. ☞483.]

**5. POST OFFICE ☞49—FRAUDULENT USE OF MAILS—CRIMINAL PROSECUTIONS —EVIDENCE.**

On such trial, where it appeared that sales of the oxypathor were made by agents in particular territories, and that literature was sent to them and shown to prospective purchasers, and no claim was made by the government that there was anything improper about the way in which sales were made, except that there were false representations in the literature, evidence as to the system under which the company of which defendant was manager did business and the manner in which sales were made was properly excluded; such exclusion not preventing accused from showing, if he so desired, that the business developed from small beginnings until it encircled the globe, or that no purchaser ever asked for his money back or expressed any dissatisfaction.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84-86; Dec. Dig. ☞49.]

**6. CRIMINAL LAW ☞777½—INSTRUCTIONS—COMMENTS ON EVIDENCE—"MATTER OF FACT."**

On such trial, a statement in the charge that men of skill and science and some of great learning had told the jury on the stand what the oxypathor was, what ingredients entered into it, and that as to such ingredients it was impossible as a matter of fact, to create any effect upon the flesh, or create any affinity of the body to take in oxygen, was not erroneous, because of the use of the phrase "matter of fact," the charge having been a very clear one, and having stated the burden of proof resting on the government most fairly towards accused, and no exception to any other part of the charge having been taken, as the phrase "matter of fact" is sometimes used in antithesis to "matter of law," and at other times in antithesis to "matter of opinion," and the phrase could not have misled the jury to suppose that they should give greater weight to the testimony of such witnesses than it was entitled to.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1807; Dec. Dig. ☞777½.

For other definitions, see Words and Phrases, First and Second Series, Matter of Fact.]

In Error to the District Court of the United States for the District of Vermont.

This cause comes here upon writ of error to review a conviction of plaintiff in error in the District Court, District of Vermont, upon an indictment under section 215 of the Criminal Code of the United States—formerly section 5480, Rev. Stat. U. S. Defendant was the general manager of a manufacturing company, which made certain instruments called "oxypathors," which were largely advertised and sold as having remarkable curative effects.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

R. M. Stanley, of Buffalo, N. Y. (George Clinton, of Buffalo, N. Y., of counsel), for plaintiff in error.

Alexander Dunnett, U. S. Atty., of St. Johnsbury, Vt. (C. E. Leslie, of St. Johnsbury, Vt., of counsel), for the United States.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. [1] The first point raised is that the indictment does not charge a crime within any statute of the United States. The indictment charges that defendant had devised a scheme or artifice to defraud; that the scheme was to sell the device called an oxypathor upon positive representations that the oxypathor among other things, "begets in reality a supplementary breathing through the skin and membranes of the human body"; that its application "increases the amount of oxygen consumed by the body"; that it "has the direct effect of increasing vital combustion and the circulation"; that it "causes the body to attract oxygen from the air"; that "by the proper use of the oxypathor the owner is absolute master of disease in all acute affections and in far advanced stages of the most formidable chronic diseases," etc.; that the scheme was to sell the oxypathor by means of said representations for $35, and to effect the sales by means of letters and advertisements sent through the mail; that defendant knew these representations to be false; that the oxypathor was in truth and in fact wholly inert, powerless, lifeless, and dead, and utterly worthless and incapable of producing any of the results aforesaid, and was entirely useless for any purpose, except to sell to people who did not know the falsity of said representations; that as one of the instruments of said scheme to defraud, and "in and as a part of the executing of said scheme to defraud, and in attempting so to do, defendant did feloniously, unlawfully, and knowingly cause to be delivered by mail a certain letter," which is set forth. It gives instructions to an agent as to methods of effecting sales, and, as the indictment charges, was delivered through the mail to the addressees.

In view of the quotations above set forth, we are at a loss to understand on what theory defendant contends that the mailing of the letter was "not for the purpose of executing the scheme." That the indictment charges an offense under section 215 seems to us too plain for argument.

[2] It is further contended that the court erred in denying motion for direction of a verdict of acquittal made at the close of the evidence. In his extended argument in support of this proposition defendant's counsel treats the cause as if the only alleged false representation was that the oxypathor "would cure all diseases," and that unless the government showed that it was absolutely worthless as a cure for disease the charge in the indictment was not proved. He ignores entirely the other representations. See quotations supra, all taken from defendant's circulars in reference to oxygen, as to supplemental breathing, to increasing the amount of oxygen consumed, absorbed by the body, etc. Whether defendant would have made as large sales if he had merely represented the oxypathor as a cure-all is not important. He went further—quite shrewdly as we think—and sought by his sug-

gestions as to its oxygen-increasing effects to induce its purchase by people who had heard of oxygen and the absolute necessity of its introduction into the system by breathing pure air. If the evidence justified the jury in finding that these assertions were false, and that he believed them to be false, they might find a verdict against him.

The case is unlike those referred to where defendant professed to cure all diseases by the use of electricity or magnetism, and did sell a device which had electro or magnetic action; or where defendant was a believer in the so-called "mind cure," or Christian Science cure, and sought to persuade others to use such mental remedy; or where the simple statement was that defendant's "Habitina" was "remedial in character when exhibited as part of the treatment of morphine."

As to the question of criminal intent—i. e., defendant's belief or nonbelief in his own representations—the enormous amount of testimony introduced, including the many letters, telling of beneficial results occurring after the use of the oxypathor, do not touch these representations as to oxygen. We think the jury might well have been satisfied that defendant perfectly well knew that the cleverly arranged device—which looked like an electric or magnetic apparatus, but was in fact neither—did not create supplementary breathing through the skin, nor make the human body greatly positive, nor cause the body to attract oxygen from the air, nor cause a great stream of oxygen to pass into the system at night while asleep, nor oxygenate the blood, nor that the oxygen which kills the poisons in blood and tissue "is supplied by the oxypathor." That they did reach this conclusion is apparent from their verdict.

[3] Error is assigned to the court's refusal to allow defendant's medical witness, Dr. Hazen, to answer the following question:

"Q. Doctor, from your knowledge and experience as a physician, and from your experience with the oxypathor, which you have here described, will you tell us whether in your opinion the oxypathor is or is not of therapeutic value in the treatment of disease?"

This seems to us a perfectly proper question, and we do not understand upon what theory the trial judge excluded it. The witness was the first physician called by the defendant, and the court may not have quite understood what it was defendant was seeking to prove. However, when the next medical witness, Dr. Taylor, was called by defendant, the question was put to him, somewhat altered in phraseology as follows:

"Q. I will reframe the question. Doctor, from your knowledge and experience as a physician, and from your knowledge and experience with the use of the oxypathor in the treatment of disease, and from your experience in those cases to which you have here testified, in your opinion, were the results which you have here testified to attributable to the use of the oxypathor in those cases?"

This question, although it seems to be in substance the same as the other, the witness was allowed to answer. Had the court been asked to allow the first witness to answer this reframed question, presumably the request would have been granted; but, whether this be so or not, we cannot find prejudicial error in excluding this one question to Dr.

Hazen, in view of the great fullness with which defendant was allowed to support his propositions by medical and lay testimony. The details will be more fully set forth after dealing with the next assignment of error.

[4] Exception was taken to the allowance of a question put to Dr. Caverly, one of the government's witnesses on rebuttal. He had been in court throughout the trial. Moreover, a large majority of defendant's testimony had been taken out of court, it was read to the jury, and this witness had himself read it. The question is:

"Q. Now, Doctor, having that in mind ['that' referring to the testimony he had heard and read], I would like to have you tell us, taking up particular cases or summarizing the evidence, I would like to have you tell us what function, if any, the oxypathor had in the cure of any or all of the diseases mentioned?"

It would, of course, have been perfectly competent for the examiner to have taken up each case separately, to have framed a hypothetical question based thereon, and then asked the question supra as to that case. Thus a hypothetical question would have been put as to John Doe's narrative of his experiences, to which the doctor might have replied that no one could tell from the narrative what disease, if any, the witness had; his narrative merely indicating a backache, which might have been of a sort that mere rest for a while in a recumbent position would have dissipated. Then a similar question might have been put as to witness Richard Roe, to which the doctor might have replied that the hypothetical question indicated a certain contagious disease; that such diseases are self-limited, they run their course; that no one undertakes to cure them; that all that is done is to try and keep up the patient's strength, so that nature may effect the cure; that the way in which the oxypathor was used involved rest, the use of hot compresses, careful attention to diet, sanitation, the bowels, etc.; and that to those things, not to the oxypathor, was the result due.

We do not think, however, that it was necessary to keep the jury sitting for days on end while long hypothetical questions were framed on 73 separate cases, many of them duplications as to symptoms, treatment, and results, if there were any shorter way of putting in the testimony, without prejudice. The question was somewhat general; if the answer had been general—e. g., "that there was nothing in any or all the cases to indicate that the oxypathor had any curative effect"— it might have been error to admit it. But the allowance of a badly framed question is not error, unless its answer brings in improper testimony. The answer in this case was most specific. The witness had considered 73 of the cases. Of these he had grouped together 23, in which the patient's narrative did not describe any pathological condition, any identifiable disease, the terms used being "backache," "pain in the knee," "nausea," etc. He had grouped together 27 other cases, which indicated that the patients had some infectious disease. The remaining group of 23 indicated the presence of other diseases, which he enumerated and described. As to each group he gave the reasons why, in his opinion, the oxypathor did not accomplish any result other than such as would have been accomplished by any inert article, which

the patient was told with much earnestness would give him relief. Thus, instead of giving some general answer to the question, which would, as counsel expresses it, have usurped the function of the jury, the witness most fairly and fully stated the conclusions which his professional experience would have led him to, had he had under observation the particular cases which he conveniently grouped together. Cross-examination could have brought up any one or more of the cases which he had classified in one or other of his groups, if it were thought necessary to go into further detail; but, reading his whole testimony, with its frank and full statements of the reasons for the conclusions he expressed, we cannot see that any prejudice resulted in thus sparing the jury the burden and possibly hopeless confusion which would have resulted from undertaking to elicit his professional opinion, individually as to each case, by a series of 73 separate long hypothetical questions.

It is unnecessary to consider some other exceptions to allowance or disallowance of individual questions to professional witnesses for these reasons. The entire testimony of all the professional witnesses and nearly the whole of the testimony of lay witnesses as to their use of the oxypathor has been read and carefully considered. The conclusion reached is that the entire subject-matter on that branch of the case was laid before the jury with exceptional fullness. Witness after witness, more than 73 of them, who had used the oxypathor was put on the stand to rehearse at great length the narrative of his ailments, of his use of the oxypathor, of the cure or the great improvement that followed its use, of his firm conviction that the oxypathor had given him relief which he had been unable to obtain from doctors who did not use it. Doctor after doctor was put on the stand to testify not only generally but with reference to specific cases that they had used the oxypathor, that they had effected cures by its use; some of them testified to their theory as to its action, that circulation had increased under its use, that an increase of poisons had been thrown out in the form of perspiration, that the symptoms after the use of the oxypathor showed sometimes the same reaction as under oxygen inhalation when administered in a gaseous form. In addition to all this, numerous letters addressed to defendant or to the Oxypathor Company, by persons who were not called or sworn, giving their experiences and commending the oxypathor, were put in evidence. Whatever may have been the fate of some individual question or objection, here or there, during this long trial, there can surely be no doubt in the mind of an impartial reader of the record that as to the alleged therapeutic value of the oxypathor defendant was allowed to put in his whole case.

On the other hand, the physicians called for the government did not undertake merely to express some general condemnation. The case on this side was put in patiently and so specifically as to give the jury assistance in reaching a conclusion. The witnesses testified that to an experienced physician nothing was indicated by the circumstance that a man felt better after he had lain recumbent for a time with the oxypathor applied to him when the only ailment he testified to was a "lame back" or "nausea." They testified to the value of rest, compresses, hot

and cold, of diet, of bathing, of exercise, of sleep, of fresh air, of regularity in the functions of the bowels, of hygiene and sanitation generally. Defendant's literature impressed upon all users of the oxypathor the importance of paying great attention to these things, and the government's witnesses testified that, when proper attention to these things had been found generally sufficient to effect a cure of some ailment, the mere circumstance that some one had used an oxypathor at the same time that the treatment was going on was no indication that it contributed anything to such result. They testified, also, as to the nature of different diseases, as to the value of hopefulness and faith, however excited, etc. We are satisfied that the whole subject of therapeutic value was fully, carefully, and intelligently presented to the jury, and that defendant was not prejudiced by any interference with the presentation of his side of the proposition.

[5] The treasurer of the Oxypathor Company being on the stand, he was asked to "tell briefly the system under which the company does business; that is, the manner in which the sales were made?" This was objected to and excluded. We see no error in this. It had already appeared that sales were made by agents in particular territories, and that certain literature was sent to them, and certain literature shown to the prospective purchasers. No claim was made by the government that there was anything improper about the way in which sales were made, except that there were false representations in the literature. It was a matter of no importance to show how much of it was done by agents, and how much directly from headquarters. In the long discussion submitted in support of this question, it is suggested that defendant wished to prove that "from small beginnings the business had developed till it encircled the globe." No such question was put to this witness, or to any other witness. It is also stated that defendant wished to prove that "no purchaser ever asked to have his money back, or expressed any dissatisfaction with the oxypathor." Certainly that was not the question which the court excluded, and it was not necessary to go into details of defendant's business, in order to lay any foundation for asking such question of any witness or witnesses competent to answer it. If defendant wished to put in evidence of this sort, he should have put his question to a witness and excepted to its disallowance. Presumably there would have been no disallowance, and no exception, had he asked the question. Nothing that the court said indicated that such a question would be disallowed. He did allow the witness to testify that testimonials to the good character of the oxypathor were being constantly forwarded by agents, and admitted in evidence packages of such letters from persons, not produced nor sworn, giving high praise to the efficiency of the oxypathor. When such liberality in the admission of proof which might help the defense was shown, it would be a miscarriage of justice to reverse this conviction on any theory that the trial judge would have excluded a question as to nonreceipt of complaints, had such a question been asked, and to do this solely because he disallowed a question which called only for details of the business which had nothing to do with the case.

[6] In the course of the charge the court said:

"Men of skill and science, and some of great learning, have told you here on the stand just what this so-called oxypathor is, what ingredients enter into it, and that as to such ingredients it is impossible, as a matter of fact, as a whole, to create any effect upon the flesh, or to create any affinity of the human body to take in oxygen, as it is claimed it will do."

This was excepted to; it is the only exception taken to the charge, which was a very clear one, and stated the burden of proof, which the government would have to sustain in order to obtain a verdict, most fairly towards defendant. The ground of objection is to the use of the phrase "as a matter of fact." The phrase "matter of fact" is sometimes used in antithesis to "matter of law"; at other times, in antithesis to "matter of opinion." We see no reason to suppose that the jury was at all misled by the use of this phrase to suppose that they should give greater weight to the testimony of the physicists who had dissected the oxypathor than their statements as to what they had found and had not found were entitled to.

It is unnecessary to discuss any other assignment of error.

The judgment is affirmed.