### SAMUELS v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. February 28, 1916.)

#### No. 4475.

1. INDICTMENT AND INFORMATION ⚖➡98—RULES FOR DETERMINING SUFFICIENCY.

In determining the sufficiency of an indictment, each count must be treated as a whole, and not merely as a part thereof.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 269; Dec. Dig. ⚖➡98.]

2. POST OFFICE ⚖➡48(4)—USING MAILS TO DEFRAUD—INDICTMENT.

In an indictment, under Criminal Code (Act March 4, 1909, c. 321) § 215, 35 Stat. 1130 (Comp. St. 1913, § 10385), for using the mails to promote a scheme to defraud, it is not necessary to use the word "knowingly," in charging the deposit of letters in the mails by defendant, where that is necessarily implied from the other averments.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 72; Dec. Dig. ⚖➡48(4).]

3. POST OFFICE ⚖➡48(4)—USING MAILS TO DEFRAUD—INDICTMENT.

That a defendant, charged with using the mails to defraud by sending out letters and circulars containing false representations as to the virtues of a medicine made and sold by him, as shown by the letters set out in the indictment, merely copied testimonials, obtained from users, containing statements as to benefits derived from such use, does not render the indictment insufficient, where it is alleged that he knew the representations made therein to be false.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 72; Dec. Dig. ⚖➡48(4).]

4. CRIMINAL LAW ⚖➡371(1)—PROSECUTION FOR USING MAILS TO DEFRAUD—EVIDENCE OF OTHER OFFENSES.

In a prosecution for using the mails to promote a scheme to defraud, evidence of other advertisements by the defendant besides those contained in the letters set out in the indictment, but of a similar nature, as also of other false claims, is admissible on the question of fraudulent intent, especially when committed continuously and for a long period of time.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830, 831; Dec. Dig. ⚖➡371(1).]

⚖➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. Post Office ⊗⇒49—Prosecution for Using Mails to Defraud—Evidence.

In such case the fact that letters sent by defendant through the mails were in response to decoy letters sent by post office inspectors does not render them inadmissible.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⊗⇒49.]

6. Criminal Law ⊗⇒479—Opinion Evidence—Competency of Experts.

An experienced chemist *held*, under the facts shown, qualified to testify as an expert as to the therapeutic value of a medicine which he had analyzed.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1067, 1068; Dec. Dig. ⊗⇒479.]

7. Criminal Law ⊗⇒439—Prosecution for Using Mails to Defraud—Evidence.

On the trial of a defendant, charged with using the mails to promote a scheme to defraud, by sending through the mails letters and circulars containing false representations as to the value of a medicine made and sold by him, and also that he was a great scientist, a book published by him, treating of the eye, was inadmissible to prove the latter claim, which could only be established by witnesses who were competent to testify on the subject.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1025; Dec. Dig. ⊗⇒439.]

8. Criminal Law ⊗⇒676—Trial—Limiting Number of Witnesses—Discretion of Court.

It is within the discretion of the trial court to limit the number of witnesses a defendant charged with a criminal offense may introduce on a single point in issue, and unless it appears clearly that there has been an abuse of discretion, which was prejudicial to defendant, an appellate court will not consider it cause for reversal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1608; Dec. Dig. ⊗⇒676.]

9. Criminal Law ⊗⇒711—Trial—Limiting Time for Argument.

It is within the discretion of the trial court to limit the time for argument in a criminal case.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1657; Dec. Dig. ⊗⇒711.]

10. Post Office ⊗⇒49—Prosecution for Using Mails to Defraud—Sufficiency of Evidence.

Evidence in a prosecution for using the mails to promote a scheme to defraud *held* sufficient to require the submission of the case to the jury.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⊗⇒49.]

11. Post Office ⊗⇒50—Prosecution for Using Mails to Defraud—Instructions.

In a prosecution for using the mails to promote a scheme to defraud, by making representations in letters and circulars sent through the mail as to the curative properties of an article made and sold as a medicine, a vital issue is as to the intent of defendant, to which his knowledge of the truth or falsity of the representations is pertinent; and the testimony of users of the remedy as to its beneficial effect, while admissible, is not determinative of such issue, and a refusal to instruct to that effect is not error.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89; Dec. Dig. ⊗⇒50.]

⊗⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

12. POST OFFICE ⬤⟿50—PROSECUTION FOR USING MAILS TO DEFRAUD—IN-
STRUCTIONS.

Instructions given in a prosecution for using the mails to promote a
scheme to defraud considered, and *held* without error.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89; Dec.
Dig. ⬤⟿50.]

In Error to the District Court of the United States for the District
of Kansas; John C. Pollock, Judge.

Criminal prosecution by the United States against Henry Samuels.
Judgment of conviction, and defendant brings error. Affirmed.

Jean Madalene and S. B. Amidon, both of Wichita, Kan. (William
W. Hooper, of Leavenworth, Kan., on the brief), for plaintiff in er-
ror.

Fred Robertson, U. S. Atty., of Kansas City, Kan. (Francis M.
Brady, Asst. U. S. Atty., of Kansas City, Kan., on the brief), for the
United States.

Before ADAMS and CARLAND, Circuit Judges, and TRIEBER,
District Judge.

TRIEBER, District Judge. The plaintiff in error, defendant in the
court below, was indicted in 11 counts for violations of section 215 of
the Penal Code, and, upon a trial having been found guilty on all of
the counts, prosecutes this writ of error to obtain a reversal.

There are 108 assignments of error, many of them mere repetitions.
The assignments necessary to consider are: (1) The sufficiency of each
of the counts in the indictment. (2) The admission of evidence of-
fered by the government, alleged to be incompetent. (3) Rejecting cer-
tain evidence offered on behalf of the defendant. (4) Error in refus-
ing a directed verdict of not guilty. (5) Error in limiting the number
of witnesses intended to be introduced on behalf of the defendant.
(6) Error in limiting counsel in their arguments to 30 minutes for each
side. (7) Error in refusing special instructions asked on behalf of
the defendant. (8) Errors in the charge of the court to the jury.

The scheme to defraud in each of the counts was the same. They
only differ as to the contents of the letters sent through the mails,
and the parties to whom they were addressed. The scheme to defraud
was described as follows:

"That he, the defendant, advertised in many parts of the United States, in
letters, newspapers, printed circulars, and papers, to the effect that he was a
scientist, and that by reason of his scientific study and knowledge he was
the originator, discoverer, owner, proprietor, and possessor of a wonderful
remedy, of great value, to be used in treating many diseases of the human
body; that said remedy was a colorless liquid made from a secret formula,
which had taken many years of his life to accomplish, and which he alone
knew, and kept as a secret; that he advertised himself as Professor H.
Samuels, and said remedy was known and advertised by him under the
name of 'Prof. H. Samuels Systematic Remedy,' and that, because of the
many wonderful cures attributed to his said remedy by those who had used it,
he had decided to merge his individual interest into a more active organization,
as he was growing old, and his remedy was of such great value to suffering
humanity, as claimed by his many patients, that he was unwilling to deny
suffering humanity the great benefits which his systematic remedy would

bring to many people; that therefore he had placed his secret formula, from which said remedy was made, in the hands of a newly organized company, with a solemn injunction that his work should go on uninterruptedly, and the company upon whom these responsibilities now devolved, and who would henceforth prepare Prof. Samuels Systematic Remedy from his original secret formula, had been organized under the name of the 'Prof. H. Samuels Remedy Company (Not Inc.),' with headquarters at Wichita, Kan.; that by the said advertising herein mentioned he would invite, incite, solicit, and induce all people suffering with diseases to communicate with and write to said company, and that the Prof. Samuels Remedy Company would continue to prepare said remedy from the original formula, and that under their direction it would be the same preparation as he had theretofore been selling throughout the United States, which had become so well and favorably known in all parts of the Union, by reason of the beneficial use thereof, which would be and was recited and attested to and vouched for by testimonials and statements of many and various persons, in letters, advertisements, and papers which, from time to time, he had and would and did prepare and cause to be made and prepared for distribution, and distribute and cause the same to be distributed to the public generally; that he would and did represent himself to be the only living person who treats through the eye many diseases, viz., cataracts, blindness, granulated lids, sore eyes, fits, eczema, kidney and bladder troubles, catarrh and deafness, heart trouble, asthma, nervous prostration, hay fever, dropsy, tumor, paralysis, epilepsy, neuralgia, goiter, and many other diseases of the human body; that many persons had used this wonderful remedy on complicated diseases, and many other ills of various kinds, and that wonderful and apparently miraculous cures had been performed by said remedy; that complicated diseases and many other ills were banished by dropping said colorless liquid in the eye; that his remedy was based on scientific principles; that he would, by artful, cunning, misleading, and carefully prepared letters and articles and printed statements, deceive those who read them, and induce them to order and buy said Prof. H. Samuels Systematic Remedy, with the belief and understanding that it had cured and would cure the many diseases and ills hereinbefore mentioned, and thereby secure as his victims those who did not understand and know much, if anything, about science and medicine, and its effect; that by testimonials and letters which he had procured from time to time, and which he would procure from time to time, from various persons, and publish and advertise the same to the public generally in newspaper advertisements and circulars, he would and did hold out and represent to the public that he was working wonderful and remarkable cures in such diseases, and did thereby in effect represent that he was working wonderful and remarkable cures in many and various diseases of a serious kind and nature; that his medicine was a wonderful medicine of great therapeutic value, and was a valuable remedy for many diseases; that it was to be used by dropping said liquid medicine in the eye, and having it come in contact with the nerves of the eye, and its curative effects would be conducted by the nerves to the various parts of the human system; that as a part of said scheme he would and did secure the testimonials of persons who claimed themselves to have been cured of some disease by his alleged systematic remedy; that as an additional part of said scheme he would advertise to the public generally that he had deposited two thousand ($2,000) dollars in a bank of Wichita, Kan., and instructed the said bank to pay said two thousand ($2,000) dollars to the first person who would prove the testimonial letters printed in his advertisements were not genuine; that the letters, papers, and advertisements and testimonials herein mentioned are too lengthy, numerous, voluminous, and otherwise unfit to set out herein, and for that reason are not set forth; that he, the said Henry Samuels, designed and intended, by means aforesaid, to cause and induce divers and various persons, residents within the United States, to communicate and open correspondence with him, under the style and address of 'Prof. H. Samuels Remedy Company (Not Inc.), of Wichita, Kan.,' by making them believe that they might be cured or benefited by the use of his said Systematic Remedy, and, having induced and caused said persons to communicate with him as aforesaid, he further designed, by letters and circulars which he would send to said persons, to

induce them to send and forward to him, the said Henry Samuels, under the name of Prof. H. Samuels Remedy Company, many and various sums of money, money orders, checks, and property of value, for said pretended Systematic Remedy; that he, the said Henry Samuels, then and there and at all the times herein mentioned, designed and intended to unlawfully and feloniously appropriate and convert said money and property to his own use for personal gain, and to return therefor to said persons his pretended Systematic Remedy for their supposed diseases, which said remedy was of no value."

The indictment then proceeds to negative all the claims made by him:

That "he knew that many of the pretenses, promises and statements set forth in said letters, newspapers, and circulars used by him in furtherance of his said scheme and artifice to defraud were false and misleading and deceptive; and he knew that the testimonials were in reality obtained from persons who did not know whether they had been cured or not by said Systematic Remedy —all of which he, the said Henry Samuels, unlawfully and feloniously did, with the intent then and there to cheat and defraud any and all persons whomsoever might be so induced as aforesaid to become victims of his said scheme and artifice to defraud."

The indictment then charges that for the purpose of carrying out and executing the scheme and artifice to defraud he did, on certain days named in the indictment, "with the intent as aforesaid unlawfully and willfully and feloniously place and cause to be placed in the post office establishment of the United States at Wichita, Kan., in said division and district, the same being a part of the post office establishment of the United States, and an authorized depository for mail," certain letters which were addressed to the parties named in the indictment, and copies of the letters are set out in full. The letters in the first, second, third, and fourth counts are identical, but addressed to different persons and mailed on different days. The letters set out in the fifth, sixth, and eighth counts are identical, and the letters set out in the seventh, ninth, tenth, and eleventh counts are identical.

[1] In determining the sufficiency of the indictment, each count must be treated as a whole, and not merely as a part thereof. Dealy v. United States, 152 U. S. 539, 14 Sup. Ct. 680, 38 L. Ed. 545; Horn v. United States, 182 Fed. 721, 105 C. C. A. 163; Hyde v. United States, 198 Fed. 610, 119 C. C. A. 493.

[2] It is claimed that the indictment is fatally defective, because it does not charge that he deposited, or caused to be deposited, in the post office of the United States, the letters set out in the indictment "knowingly," although each count charges that he devised a scheme and artifice to defraud "unlawfully, knowingly, fraudulently, designedly, and falsely." The statute does not require it, for it does not in this connection use the word "knowingly"; and, this being a statutory offense, it is only necessary to charge it in the general language of the statute, provided that the description is accompanied by a statement of all the particulars essential to constitute the offense, or crime, and to acquaint the accused with the nature of the charge. United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516; Brooks v. United States, 146 Fed. 224, 76 C. C. A. 581; Lemon v. United States, 164 Fed. 593, 90 C. C. A. 617.

It is true that, in order to constitute the offense charged, the de-

fendant must have either deposited these letters in the post office, to be carried through the mails to the parties to whom they were addressed, or caused it to be done, knowing that they were for the purpose of carrying into effect the scheme to defraud charged in the indictment. But each count did, in effect, charge it. The language used is that he "did then and there, and on or about [naming the day], with the intent as aforesaid, unlawfully and willfully and feloniously place and cause to be placed in the post office establishment of the United States," etc., the letters set out in the indictment. This clearly was sufficient. Felton v. United States, 96 U. S. 699, 24 L. Ed. 875; Spur v. United States, 174 U. S. 728–734, 19 Sup. Ct. 812, 43 L. Ed. 1150; Horn v. United States, 182 Fed. 721, 105 C. C. A. 163.

[3] It is next claimed that in the letters and advertisements the defendant only claimed what had been said, or written, to him by those who had used his preparation, and therefore these representations were not his, but those of his patients. But the gist of the offense is, not what others thought, but whether he knew them to be false. Sending them out with knowledge that they were false, he made them his own. Moses v. United States, 221 Fed. 863, 137 C. C. A. 433.

The court committed no error in overruling the motion to quash the indictment, and the motion in arrest of judgment filed after the conviction, as the indictment states all the facts with much greater particularity than the law requires, and clearly states the facts which constitute a scheme to defraud, and the use of the mails for the purpose of promoting it. Colburn v. United States, 223 Fed. 590, 139 C. C. A. 136, where Judge Adams, speaking for this court, fully summarized the law applicable to prosecutions of this class.

[4] Did the court err in the admission of the evidence offered by the government? It is claimed that the admission of the advertisements of the defendant, published in many newspapers, paying to one advertising firm as much as $175,000 in one year for this advertising, and which were sent broadcast to thousands of persons, was prejudicial error, and also the admission of the letters from various parties, claiming to suffer from many different ailments—one from a broken nose; another from rupture; another from syphilis; one from goiter; one from a bullet wound in the thigh—and asking whether or not his remedy would cure them. To these letters he replied that from the testimonials in his possession other persons had been cured from such ailments by the use of his medicine.

The medicine, as he described it in his circulars, was a clear liquid, and to be administered through the eyes, and would serve as a natural nerve vitalizer. In his replies to these letters he explained that:

"The optic nerve is the only large nerve that comes to the surface, and the use of this medicine will affect every part of the body, thus causing the different organs of the body to perform their proper functions."

The ground assigned for the alleged error is that these claims and advertisements were not described in any of the counts of the indictment, and therefore should not have been admitted. The fact that these letters, circulars, and advertisements were not set out in the

indictment does not prevent their admissibility, in a case of this nature. As the fraudulent intent is one of the material allegations in the indictment, evidence of other and similar ventures by the accused are properly admissible as bearing on the question of intent. The intention of a person charged with a crime can hardly ever be shown by direct evidence, and for this reason it is permissible to introduce evidence of other acts of a similar nature, especially when committed continuously and for a long period of time, thereby establishing the fraudulent intent. Withaup v. United States, 127 Fed. 530, 62 C. C. A. 328; Olson v. United States, 133 Fed. 849, 67 C. C. A. 21; Colt v. United States, 190 Fed. 305, 111 C. C. A. 205; Schultz v. United States, 200 Fed. 234, 118 C. C. A. 420; Trent v. United States, 228 Fed. 648, 143 C. C. A. 170.

This also applies to the testimony that "Blind Joe," who it was claimed by the defendant, in some of his circulars, had been cured of his blindness by the use of this medicine, was not in fact so cured, but was totally blind up to the time of his death.

[5] Nor is the objection to the admissibility of the letters sent by the defendant through the mails in response to decoy letters of post office inspectors well taken. Grimm v. United States, 156 U. S. 604, 610, 15 Sup. Ct. 470, 39 L. Ed. 550; Scott v. United States, 172 U. S. 344, 19 Sup. Ct. 209, 43 L. Ed. 471; Ackley v. United States, 200 Fed. 217, 118 C. C. A. 403.

[6] It is next claimed that it was error to admit the opinion of Mr. Nelson relative to the therapeutic value of the medicine, because the witness, although he had qualified as an experienced chemist, was not shown to be qualified to testify as an expert physician. Mr. Nelson had analyzed the defendant's medicine, and testified that it was a solution of hydrant water, containing some salt and sugar, and some slight traces of calcium and magnesium phosphates, and a very minute trace of boracic acid. He was asked whether these traces were of sufficient quantity to have any therapeutic value or force. He had testified that he had not studied medicine, but that from his experience and knowledge of chemistry he knew whether the preparation had any contents that had a therapeutic value as a medicine.

There was no error in this, for it was for the jury to determine what weight to give to his evidence on that point, taking into consideration the witness' knowledge and experience. But, even if it had been error, it was not prejudicial, as four physicians of learning and experience, and who had properly qualified as experts, testified to the same effect.

Nor was it error to permit Dr. Dorsey to answer the hypothetical question put to him, as to the effect of a preparation containing the ingredients found by the chemists by proper analysis. There was nothing of an assumed character in the question. It was based upon testimony in the case.

The evidence that the defendant is not a great scientist, a man of scientific education, and a man of letters and learning, as claimed in his advertisements, and which was charged in the indictment to be untrue, was admissible, although the witness testified that his

testimony was based on an acquaintance with the defendant 20 years before, at the time when the defendant was a middle-aged man. It is unusual that a man who, when middle-aged, has no scientific training or knowledge, should in old age become a great scientist. In any event it was admissible as a circumstance, the defendant having an opportunity to show that since then he had by study become a great scientist. There was no prejudicial error.

Did the court commit error in excluding certain evidence offered by the defendant? It is claimed that the court erred in refusing to permit the defendant, on the cross-examination of Dr. Dorsey, to practically introduce Gray's work on Anatomy, by asking him question after question from that book. As this was new matter, on which Dr. Dorsey had not been examined on his direct examination, it was properly excluded. It is true the witness might have been examined as to the value of Dr. Gray's work, with which, he testified, he was familiar; but, if the defendant wanted to introduce that work as evidence, he should have offered it as his own testimony, and for that purpose he might have made Dr. Dorsey his own witness at the proper time.

[7] Nor was it error for the court to refuse to admit in evidence a copy of the defendant's publication on the eye. At best it was merely a self-serving statement. If he wanted to prove that he was a great scientist by reason of having written and published that book, he should have introduced witnesses who were qualified to testify on that point. The jury was not the proper body to examine the book and determine from it whether he was a great scientist or not. Besides no foundation had been laid to prove the real author of the book. He may have employed a scientist to write it and published it as his own work.

[8] Did the court err in limiting the number of witnesses offered by the defendant for the purpose of proving by them that they had been cured of many different ailments by the use of the defendant's preparation? It appears that, after 35 witnesses had testified on behalf of the defendant on that point, the court announced that only 6 more witnesses would be permitted to testify along that line. After these 6 witnesses had testified, the defendant wanted to introduce 20 or 25 more witnesses, some of them as to other diseases, of which, it was claimed, they had been cured by the use of this preparation, and to which no other witnesses had testified.

At best this evidence was merely cumulative, and it was a matter of discretion for the trial judge to determine whether any more witnesses would be permitted to testify after 41 witnesses had done so. This is a matter which must be left to the discretion of the trial judge, and unless it appears clearly that there had been an abuse of the discretion, which was prejudicial to the defendant, the appellate court will not consider it cause for reversal. Mergentheim v. State, 107 Ind. 567, 8 N. E. 568. In our opinion there was no such abuse.

[9] This also applies to the action of the court in limiting the time for argument, each side being given the same time. Lucas v. Commonwealth, 149 Ky. 495, 149 S. W. 861, 42 L. R. A. (N. S.) 209, a

murder trial, in which counsel were limited in their argument to 30 minutes a side. In this case the issues were few, and not complicated, and in our opinion the court did not abuse the discretion necessarily reposed in it.

[10] It is claimed that the court should have instructed the jury to return a verdict of not guilty. The testimony is very voluminous, and it will serve no useful purpose to prolong this opinion by setting it out in detail. We have carefully read and considered it, and we are satisfied that the facts established were of such a nature that it was proper for the court to submit the case to the jury for final determination.

The extravagant claims made for the preparation to cure almost all the diseases known, many of them of a nature which can only be cured by surgery; the undisputed fact that the preparation contained nothing but ordinary hydrant water of the city of Wichita, where it was prepared, with a little salt and sugar in it, the minute trace of boracic acid found in it being indigenous to the hydrant water of that city; the high price charged for it, at first $5 a bottle, afterwards $3 a bottle, when the cost of its preparation was trifling; the testimony of the physicians that it had no therapeutic value whatever—all these proofs certainly justified the submission of the case to the jury to determine whether the so-called medicine was merely a scheme to defraud, and that the mails had been used for the purpose of carrying it out.

[11] Did the court err in refusing certain instructions asked on behalf of the defendant? One of the important questions in issue was what the defendant knew to be the true facts, and not what others believed. If he knew that the medicine was not a cure for the many ailments claimed for it, and in fact for none, the fact that many of those who used it believed that it had cured them would be no defense, no more than the defendant could have been found guilty, because some of those who had used his medicine did not obtain the relief expected from it, if, as a reasonable man he honestly believed, or had reasonable cause to believe, that it possessed the curative properties he claimed for it. The evidence of his patients bore on his intent, and therefore was properly admitted by the court; but it was for the jury to determine from all the evidence what the defendant's intention was, regardless of what some, or all of his patients believed. Harrison v. United States, 200 Fed. 662, 119 C. C. A. 78; Moses v. United States, supra.

In School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90, and Post v. United States, 135 Fed. 1, 67 C. C. A. 569, 70 L. R. A. 989, relied on by the defendant, the material issues were whether mental or magnetic healers were within the meaning of the statute, when they honestly believed in the efficacy of their belief, and it was held that, as it was a recognized school of healing, believed in by a large number of people, it was not a scheme to defraud, if the defendant believed in it in good faith. It is a well-known fact that a very large and intelligent class of people believe that Christian Science, and other similar beliefs, which teach that faith

alone, without the aid of drugs or surgery, can effect cures for many diseases.

Nor is United States v. Johnson, 221 U. S. 488, 31 Sup. Ct. 627, 55 L. Ed. 823, applicable to the facts in this case. That was a prosecution for the violation of the Pure Food and Drug Act of June 30, 1906 (34 Stat. 768, c. 3915 [Comp. St. 1913, §§ 8717–8728]), and the only question for determination was whether the false statements of the curative powers of the medicine printed on the label were within the provisions of that act? The court held that they were not. By Act Aug. 23, 1912, c. 352, 37 Stat. 417 (Comp. St. 1913, § 8724), this was remedied, and in Seven Cases, Eckman's Alternatives v. United States, 239 U. S. 510, 36 Sup. Ct. 190, 60 L. Ed. ——, the Supreme Court held such false claims were within the amendatory act, and that the act was constitutional. This case also explains and distinguishes the School of Magnetic Healing Case.

Nor is Bruce v. United States, 202 Fed. 98, 120 C. C. A. 370, applicable to the facts in this case. Although there was evidence tending to show that many physicians indorsed a treatment for the morphine habit by the use of a medicine containing morphine, if administered in gradually reduced quantities, the court refused to give an instruction submitting that question to the jury. This was held to be error. In the instant case the evidence of the government tended to show that the preparation sold by the defendant, and which he claimed to be of great curative powers, was not even a medicine, and that he must have known that fact. As stated in the Seven Cases Eckman's Alternatives Case:

"That false and fraudulent representations may be made with respect to the curative effect of substances is obvious. It is said that the owner has the right to give his views regarding the effect of his drugs. But state of mind is itself a fact, and may be a material fact, and false and fraudulent representations may be made about it; and persons who make or deal in substances or compositions alleged to be curative are in a position to have superior knowledge, and may be held to good faith in their statements [citing authorities]. It cannot be said, for example, that one who should put inert matter or a worthless composition in the channels of trade, labeled or described in an accompanying circular as a cure for disease, when he knows it is not, is beyond the reach of the lawmaking power."

Other special instructions asked on behalf of the defendant, and which were refused by the court, were fully covered by the charge of the court to the jury, and those not so covered were clearly erroneous, and properly refused.

[12] It is next claimed that the court erred in its charge to the jury when it said:

"If you find beyond a reasonable doubt, from the witnesses offered here, what this remedy consisted of, then inquire whether or not a reasonable man, knowing the contents of the remedy, would or could believe it to be a curative remedy."

In determining the correctness of a general charge to the jury, it will not do to take certain excerpts and complain of these. The well-established rule is that the charge must be taken as a whole, and if, so taken, it states the law correctly, there is no cause for reversal. Horn v. United States, supra. The above excerpt was given in con-

nection with a full statement about the presumption of innocence and the burden on the government to prove all material allegations beyond a reasonable doubt, and the question submitted to the jury was whether the defendant was engaged in prosecuting a scheme and device for getting money from others for the so-called remedy, which he knew would not and could not cure the ailments of those to whom he was selling it, and for the purpose of carrying out this scheme he used the mails as charged in the indictment. The court said:

"The defendant was selling what he called a remedy, and as he was selling a remedy he is presumed to have known what it contained, and, knowing what it contained, did he believe it to be a remedy for the diseases for which he was offering it for sale? If he believed that in good faith, he had a right to conduct the business. But if, knowing the contents of this remedy, he knew it did not have the curative properties, * * * then he was using a scheme to defraud those who purchased from him. * * * Now, gentlemen, I think you understand the issues which are presented to you in this case for your determination. It is not a question in this case what others may have thought about this matter at all, except in so far as what others said or wrote might tend to prove or disprove what the defendant thought. The question is what the defendant knew and intended. If he intended to devise a scheme to defraud, or had devised one, and used the mails as charged in the different counts of this indictment in carrying out that scheme, then he must be convicted, if you believe that beyond a reasonable doubt; but, if not, he must be acquitted."

Nor did the court err in its charge to the jury when it returned for further instructions. The jury asked this question:

"Shall we follow the evidence introduced as to Mr. Samuels' belief, his own belief, in the efficacy of the treatment?"

The court in response to this question told the jury:

"Why, gentlemen, I charged you that this case depends upon—so far as whether the defendant had devised a scheme to defraud, depends upon—the character of business that the defendant was doing. So long as one honestly engages in business, although he may be mistaken, if he is honestly mistaken, this statute does not apply. This act applies to a case where one has devised a scheme to defraud others, and uses the mails in executing that scheme or attempting to execute it. Now allow me to instance. A man running a retail business may buy goods from the trade far in excess of his ability to pay for them, but if he honestly believes he can pay for them, and intends to pay for them, that is one thing; but if he buys, not intending to pay, then he is using his business as a scheme, a cloak to defraud."

Thereupon another question was asked by the jury:

"Whether or not—the question of his intelligence, the question of the use of common sense, in determining whether or not he knew whether his medicine would cure or not. In other words, we did not have any evidence as to the defendant's intelligence?"

To this question the court responded:

"Well, now, gentlemen, a jury is composed of reasonable human beings. In the absence of proof to the contrary, a jury presumes that other human beings are reasonable creatures. So, in arriving at matters of this kind, you use your intelligence. You look at motives; and where the conduct of any one is brought into controversy, and the intelligence or lack of intelligence of such person is not shown by the evidence, you presume he is a person of average intelligence or reason; that he is a reasonable creature. If, however, the question of the intelligence of the party comes up in the evidence, and there is proof on that subject, then you follow the evidence. But in the ab-

sence of any proof you presume that the person is of average intelligence, that he is a reasonable human creature."

We can see nothing prejudicial in this. The law presumes every person to be of ordinary intelligence, unless he is shown to be otherwise, and certainly a man who claims to be a great scientist, and of great expertness in medical science, would, in the absence of evidence to the contrary, be presumed to be of ordinary intelligence.

A careful examination of the voluminous record and the many authorities which able counsel have cited to us fail to show any prejudicial error.

The judgment is affirmed.