### VALMAS DRUG CO. v. SMOOTS.

(Circuit Court of Appeals, Sixth Circuit. December 8, 1920.)

No. 3430.

1. **Evidence ⟨⟩544—Physician in general practice competent to testify as to cause of eye disease.**

   A physician in general practice *held* competent to testify as an expert that in his opinion a diseased condition of plaintiff's eye was caused by the presence of zinc sulphate in an eyewash.

2. **Druggists ⟨⟩9—Liable for negligence in selling harmful preparation.**

   Medical testimony that zinc sulphate, in the proportion contained in an eyewash prepared and sold by defendant, was, or might be, injurious when the wash was used as directed, *held* sufficient to justify submission to the jury of the question of defendant's negligence in placing it on the market, coupled with statements on the containers and in advertisements that it was harmless, and recommending it as a home remedy.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Druggists ☞9—Risk from harmful ingredient in preparation sold generally not assumed by purchaser.**

One not a physician, who purchased and used an eyewash recommended by the maker for use as a home remedy and bearing a statement on the container that it was harmless, cannot be held, as matter of law, to have assumed the risk because a statement of the ingredients was also given.

In Error to the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Action at law by Carrie Smoots against the Valmas Drug Company. Judgment for plaintiff, and defendant brings error. Affirmed.

James V. Oxtoby, of Detroit, Mich. (Oxtoby & Wilkinson, of Detroit, Mich., on the brief), for plaintiff in error.

Eugene P. Berry, of Detroit, Mich. (Berry & Berry, of Detroit, Mich., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Writ to review judgment against defendant Drug Company for injuries alleged to have been suffered by plaintiff through the use of an eyewash manufactured and put upon the market by defendant.

Defendant caused to be manufactured and placed upon the market, by selling to wholesale druggists, tablets for making an eyewash, called "Bon-Opto," doing considerable advertising at Detroit, Mich., through an advertising agency. The package intended for the individual consumer contained a 2-ounce bottle, an eyecup and 14 five-grain tablets. According to the accompanying directions, the treatment was to be had by dissolving one of the tablets in the bottle full of water, the entire of the two-ounce solution to be used for a given eye bath. The tablets, according to the formula indorsed upon the package, contained chloretone, zinc sulphate, sodium chloride, boric acid, menthe poivree, and camphre de menthe. The quantities of the various ingredients were not given on the package, nor was the formula otherwise given by defendant to the public. Each tablet contained $^{21}/_{125}$ of a grain of zinc sulphate (white vitriol), which was a trifle more than 3 per cent. of the contents of the tablet. The package was accompanied by detailed directions for applying the solution to the eyes, together with a series of exercises therefor, and for the general health, calculated to extend over a period of six months. Application of the wash "two to four times daily for best results" was recommended. The package contained an indorsement that Bon-Opto was "for use by physicians and as a home remedy in the treatment of eye troubles"; also a legend announcing it to be "healing, soothing, non-irritating, and harmless." On another face was a statement which we print in the margin.[1]

---

[1] "For use by physicians and as a home remedy in the treatment of inflamed, weak, watery, tired, sticky, sore, irritated eyes and eyelids, acute and chronic catarrhal conjunctivitis, congestion of the eye, either recent or of long standing, caused by colds, overwork, or exposure to smoke, wind, sun and dust encountered in automobiling, travel, etc. Bon-Opto may be prescribed and used freely."

The evidence on plaintiff's part tended to show that, on reading a newspaper advertisement "that you could throw away your glasses" if you used Bon-Opto, she bought a bottle at a retail drug store; that she was then 45 years old, was "going through changes," and had used glasses for reading and sewing (but not otherwise) for about 14 years, having changed them twice; that her glasses needed changing, and that she bought the remedy because of the newspaper advertisement mentioned, her eyes being otherwise well; that after reading the directions carefully she used 11 of the tablets on as many nights and as directed by the literature accompanying the package, bathing only the right eye, intending to treat the left eye similarly in case the right eye was benefited; that each use of the tablet caused smarting which at first continued about 10 or 15 minutes, and then passed off until the next tablet was used; that her eye got worse and inflamed; that after about a month she consulted a physician in general practice, who found an inflammation of the outer membrane of the eye, which was then so bad as to require bandaging to protect it from the light; that the physician gave her a prescription which she had filled several times, causing some temporary, but not permanent, relief; that later her eyes again troubled her, and her physician advised her to consult a specialist, which she did some months later, with the result that four ulcers were found on her right eye, which the specialist treated for two or three months.

It appeared without dispute that zinc sulphate is an astringent. There was testimony which would support a conclusion, not only that zinc sulphate would not be prescribed for defective vision or for the purpose of having a person do away with glasses, that there is no "catch-all" preparation for diseases or conditions of the eyes, but that zinc sulphate is not suitable for all cases of weak eyes; that it should be used with caution, and only on physician's prescription; that it is irritative, and if continued long enough causes changes in the structure of the eye; and that the condition from which plaintiff suffered resulted from the use of the zinc sulphate. On the other hand, there was competent testimony that zinc sulphate was a common ingredient in eyewashes, and that so weak a solution as used by plaintiff would not injure the eye.

The assignments of error, so far as argued, are: First, the admission of the testimony of the general medical practitioner referred to, who it is alleged was incompetent to give expert testimony; and, second, the refusal of the motion and requests to direct verdict for defendant, on the grounds (a) that there was no evidence of negligence on defendant's part; (b) that the claim of injury from the use of the tablets was merely speculative; (c) that there was no evidence that the presence of zinc sulphate in the tablets was the proximate cause of plaintiff's injuries; and (d) that inasmuch as plaintiff was advised by indorsement on the package containing the tablets that they contained zinc sulphate, and as the quantity in a given tablet was in fact but slightly more than 3 per cent. of the total ingredients of the tablet, plaintiff was sufficiently advised (by such description) of the presence of zinc sulphate, and so assumed the risk of using it.

[1] 1. The general medical practitioner was permitted to testify, against defendant's objection, in answer to a hypothetical question, that on the assumptions contained therein it was his opinion that the condition of plaintiff's eye, from which she suffered, including the ulcers thereon, was caused by the use of the zinc sulphate. Error is assigned upon this ruling, as well as upon the refusal to strike out the testimony of the witness generally as to the cause of plaintiff's suffering and injury—all on the ground that the witness was not competent to testify as an expert.

The objection and motion to strike were properly overruled. The witness obtained his medical education at the Saginaw Valley Medical College and the Detroit College of Medicine; he had been a practicing physician for 25 years, and was then engaged in the general practice of medicine; while he had never given particular attention to diseases of the eye, he did undertake to treat such diseases until he concluded, through their failure to respond to his treatment, that they should be referred to a specialist. He treated plaintiff for a time following the use of the eyewash. The facts that he was not an oculist, had never made a specialty of any particular branch of his profession, and had never used an eyewash containing zinc sulphate, did not, as matter of law, make him incompetent to testify as an expert. His testimony indicated that he was acquainted, from actual practice, with the nature and effect of zinc sulphate on the human system and its members generally. It is not to be presumed that reputable medical colleges fail to give suitable instruction in the fundamental principles of materia medica, toxicology, and opthalmology, or that one without either instruction or experience on these subjects would be permitted to engage in general practice in Michigan. The weight of his testimony was for the jury. This conclusion accords with the general weight of authority. Samuels v. United States (C. C. A. 8) 232 Fed. 536, 542, 146 C. C. A. 494, Ann. Cas. 1917A, 711; Detroit Ry. Co. v. Kimball, (C. C. A. 6) 211 Fed. 633, 636, 128 C. C. A. 565; People v. Thacker, 108 Mich. 652, 660, 66 N. W. 562; Hardiman v. Brown, 162 Mass. 585, 587, 39 N. E. 192; Siebert v. People, 143 Ill. 571, 579 et seq., 32 N. E. 431; People v. Benham, 160 N. Y. 402, 440, 441, 55 N. E. 11; 1 Wigmore on Evidence, § 687.

2. The refusal to direct verdict for defendant; and, first, on the ground that there was no evidence that defendant was negligent. We accept the statement of defendant's counsel that the question on this branch of the case is:

"Whether the use of $21/_{125}$ of a grain of zinc sulphate in each tablet was negligence, taken in connection with the advertisement which plaintiff below claimed to have relied upon in purchasing and using the tablets and the trouble with her eyes as testified to by her."

Unquestionably, the evidence would have supported a verdict for defendant. It may also be conceded, at least for the purposes of this opinion, that without the testimony of the general practitioner there was not sufficient proof of defendant's negligence to justify submitting the case to the jury. But the testimony of that witness substantially tended to show negligence. He testified that—

"The main proposition is the constant use of the drug with the zinc sulphate in it, or of even a smaller per cent., 3 per cent. constantly used as she used it, a woman of her age, with the condition existing in her eyes as I have stated, that the astringent would cause the condition she suffered from. * * * I mean the zinc sulphate and the per cent. in Bon-Opto."

True, defendant's president testified that, before undertaking the manufacture of the tablets, he consulted and was told by several physicians and specialists that there was nothing about the tablet that would injure any one's eyes, and there is also testimony that even a far larger proportion of zinc sulphate than used in Bon-Opto was harmless. But the jury was not bound to accept this testimony as relieving defendant of negligence, in view of the evidence on plaintiff's part as to the effect of zinc sulphate in the quantity used, and having in mind the newspaper advertisement testified to by plaintiff, as well as the representations on the package that the remedy was not only "nonirritating and harmless," but that it was for use as "a home remedy"—implying that it was safe in all cases and without occasion to resort to physicians' advice or prescription. The jury might well have concluded that, although it was customary to use as much or more zinc sulphate in an eyewash, it was negligent to offer it to the public, not only without caution, but with the sweeping (and, at least in one case, extravagant) claims said to have been made for it. See Simpson v. United States (C. C. A. 6) 241 Fed. 841, 844, 845, 154 C. C. A. 543. In our opinion there was substantial proof of defendant's negligence requiring the submission of the case to the jury.

[2] 3. The trial court properly denied the requests for direction of verdict on the grounds of lack of evidence that the zinc sulphate contained in defendant's tablets was the proximate cause of plaintiff's injury, and that the proof of such cause was purely speculative. If the evidence on plaintiff's part is to be accepted as true, there was substantial evidence, not only that such use was a proximate cause of plaintiff's injuries, but that it was the sole proximate cause thereof. The testimony, taken as a whole, is not rendered speculative, nor does evidence of proximate cause disappear, through the consideration, standing alone, that the inflammatory condition of plaintiff's eye when first seen by the medical practitioner was of a character and appearance which might have been caused otherwise than by the use of zinc sulphate, as, for instance, by infection, or by irritation incident to contact of foreign matter with the membrane of the eye. This consideration did not stand alone.

[3] 4. Nor did the court err in refusing the request for directed verdict on the ground that plaintiff had assumed whatever risk there was in using the tablets. It is true, she was advised of the presence of zinc sulphate, although not of the amount thereof; but plaintiff did not assume the risk from its use, unless she knew and appreciated the danger therefrom, or should have done so. Yazoo R. R. Co. v. Wright (C. C. A. 6) 207 Fed. 281, 285, 125 C. C. A. 25. Plainly, plaintiff could not be held, as matter of law, to have assumed the risk of harm in the face of defendant's assurance, indorsed upon the package, that there was no danger of harm.

The judgment of the District Court is affirmed.